[Civ. No. 31256.   Second Dist., Div. One.   Feb. 26, 1969.]

JOSEPH L. VENTURA et al., Plaintiffs and Appellants, v.
C. W. COLGROVE et al., Defendants and Respondents.

Paul R. Hutchinson, L. H. Phillips and James A. Irwin for Plaintiffs and Appellants.

Edward L. Lascher as Amicus Curiae on behalf of Plaintiffs and Appellants.

Walter M. Gleason for Defendants and Respondents.

KINCAID, J. pro tem.*—Appeal is taken herein  from a judgment filed November 5, 1964, in favor of defendants, following a trial by court limited to the determination of

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

certain affirmative defenses pleaded by defendants in their amended answers. The trial did not involve a determination of the legal merits of the four causes of action alleged in plaintiffs' third amended and supplemental complaint filed on June 18, 1962. Plaintiffs' first complaint was filed herein on June 24, 1954.

The first and second causes of action of plaintiffs' third and supplemental complaint were by plaintiff Joseph L. Ventura and the third and fourth by Walter E. Fowler. The first and third were against C. W. Colgrove only, while the second and fourth were against Colgrove, his wife Jennie D. and their daughters Janice Colgrove Whitehouse and Helen Colgrove Wilcox. They sought damages for breach of an alleged, both written and oral, agreement of February 9, 1948, between plaintiffs and Colgrove; to impress a trust upon the westerly half of the land subleased by Colgrove from Norris Oil Co. and F. R. Anderson Associates, and to compel the assignment to plaintiffs of participating rights in the overriding percents of defendants to the extent necessary to give them their claimed share of the oil production from the entire leasehold.

They allege generally that Colgrove, a "wildcat" oil operator, had over a period of years solicited them, among others, to loan him money to further his oil speculations and that from his oil finds he would repay them plus a bonus in oil leases.

Plaintiffs further allege that in January 1948 Colgrove held an oil and gas sublease in the Cuyama Valley, California from Norris Oil Company. While no oil had been found thereon, on January 26 and February 9, 1948, he wrote to plaintiffs and others who had advanced money to him through the years by offering to settle his indebtedness with them by assigning a percentage of his overriding oil royalties to a trust, his friends to receive, if they elected to do so, one unit for each dollar advanced to him.

That Cuyama Valley had not been surveyed at the time of the Colgrove sublease and all parties thought that the one-eighth of a section described in the sublease contained about 80 acres. Before the settlement was carried out, Colgrove discovered that owing to indefiniteness in the surveys and in the description of the land in the sublease it actually comprised 160 acres or double the area thought. He did not reveal this information to plaintffs in the manner required by one acting in trust and confidence, but took steps to get this newly dis-

covered acreage in the sublease away from participation by plaintiffs, and hold it for himself and family, alone, while plaintiffs were ignorant of the full facts.

That first he got a substitute sublease from Norris Oil Company describing by metes and bounds the land that covered the 160 acres. Then he drew two subleases by metes and bounds to what comprised the easterly and westerly halves of the leased land. He kept the lease to the westerly half for himself. He assigned to the plaintiffs and others the interest which he had promised them in the whole lease to what was the easterly half only. The westerly half turned out to be much more valuable and resulted in defendant Colgrove and his family obtaining a very large fortune from the oil it produced.

Plaintiffs claim that this was a fraudulent breach of the settlement agreement and a conspiracy to conceal and take from them their interest in half of the lease; that they had trusted and relied on Colgrove, as he well knew, so they did not discover this fraud until 1951; that within three years thereafter they filed this suit.

The amended answers of defendants, in addition to denials of allegations on their merits, alleged the affirmative defenses, primarily the statutes of limitations, the statutes of frauds, accord and satisfaction and release.

Following a protracted trial, judgment was rendered for defendants. Critical findings of fact and conclusions of law relating to the affirmative defenses are in part: That no fiduciary relationship existed between plaintiffs and defendants at any of the times herein involved.

That, as distinguished from a fiduciary relationship, a confidential friendship of trust and confidence was reposed by the two plaintiffs in defendant C. W. Colgrove only, which existed between them during the period from about 1938 to April of 1950.

That by reason of the covenants implied by law on the part of Colgrove under the alleged contract of February 1948, and the personal confidential friendship between plaintiffs and Colgrove, Colgrove had a duty to expressly disclose to plaintiffs that he had obtained the Norris-Colgrove 1948 sublease in the place and stead of the prior subleases without payment of an additional sum or consideration; that under said 1948 sublease the acreage to him was 160 acres; that he had divided such acreage into an east half and a west half through the execution of the two Colgrove-Anderson subleases; that he

had assigned only the east half to trusts numbers one and two; that plaintiffs were only participating in the east half as beneficiaries of such trusts and that neither plaintiffs nor Cuyama Syndicate were participating in the west half or were beneficiaries of trust number three; that he had assigned the west half to trust number three in which only he and his family were participating.

That Colgrove by not expressly disclosing to plaintiffs, between February 9, 1948, and July 1948, the foregoing facts breached the duty devolved upon him by law and by reason of said confidential friendship and thereby was guilty of constructive but not actual fraud as to plaintiffs.

That the failure and omission by Colgrove, prior to the issuance and delivery to plaintiffs in July 1948 of the Cuyama Syndicate shares, to expressly advise plaintiffs as to the foregoing facts and transactions was not intentionally or knowingly done or omitted by Colgrove to deceive or defraud plaintiffs or either of them or to induce them to enter the alleged contract of 1948 or suppressed by him, or calculated or fitted by him to mislead either plaintiff to his prejudice.

That during the period February to July 1948, plaintiffs had actual notice of circumstances sufficient to put a prudent man on inquiry as to all the pertinent facts involved and therefore had constructive notice thereof.

That commencing in July 1948 plaintiffs had actual notice and knowledge of all such pertinent facts.

That the alleged contract of 1948 did not arise out of any legal relationship such as a preexisting partnership, joint venture or agency. The only legal relationship that existed between plaintiffs and Colgrove during February 1948, and with reference to the Norris-Colgrove subleases, was that of debtor and creditor by the loan advancement of funds by plaintiffs to Colgrove.

The alleged contract between plaintiffs and Colgrove in February 1948 did not of or by itself create a trust or fiduciary relationship or fiduciary duty as between them.

That while the implied covenants within said alleged contract on the part of Colgrove of fair dealings and good faith did create a duty of express disclosure to plaintiffs the breach of which amounted to constructive fraud, they did not constitute Colgrove a trustee nor create a trust or a fiduciary relationship either prior to, in the negotiations for, or in the performance of the contract.

The alleged contract of February 1948 created no legal

relationship other than that of buyer and seller of a beneficial interest in Colgrove's overridng royalties under the Norris-Colgrove sublease and the Colgrove-Anderson sublease through a voluntary trust. Colgrove agreed to assign certain overriding royalties to such trust and cause Cuyama Syndicate to be a beneficiary thereof and assign to plaintiffs certain beneficial interests therein. Plaintiffs agreed to accept them in full payment and satisfaction of all "monetary obligations."

There was no fraud, actual or constructive, in Colgrove selecting the west half of the property subject to the Norris-Colgrove 1948 sublease for himself and family through trust number three.

Plaintiffs had actual notice and knowledge of the facts constituting the constructive fraud on the part of Colgrove by September 1949, and constructive knowledge thereof prior thereto. The confidential friendship between plaintiffs and Colgrove terminated in April 1950 and thereafter neither plaintiff was a friend of or reposed any trust or confidence in Colgrove.

Some four years and eight months elapsed from the date of discovery of both the alleged actual and constructive frauds and four years and two months elapsed from date of termination of the confidential friendship between the parties before the original complaint was filed herein on June 24, 1954.

The court concluded that: The action of plaintiffs being for damages for breach of an alleged contract, or for specific performance thereof, to wit, that Colgrove agreed to but did not perform his alleged covenants to cause Cuyama Syndicate to be a beneficiary of a voluntary express trust, to which Colgrove allegedly agreed to sign a lessee's overriding royalty in and to the entire acreage the subject of the Norris-Colgrove sublease, related to an interest in real property.

That the only assignment actually made by Colgrove concerning plaintiffs covered about 70 acres in the east half, said assignment being to trust number one and an additional area of 10 acres, the balance of the east half, to trust number two. To entitle Cuyama Syndicate Trust to a beneficial interest in lessee's overriding royalty in the entire acreage, the subject of the Norris-Colgrove sublease, Colgrove would have to assign to said trusts numbers one and two the same proportion of said sublease in and to the west half of the property subject thereto. Such sought assignment is an interest in real property. No cause of action is alleged to quiet title to any interest in real property.

. The accounting sought is merely incidental to the cause of action for breach of the alleged contract or for specific performance thereof.

A lessee's overriding royalty is an incorporeal hereditament, a *profit à prendre,* an interest in real property.

Plaintiff's four causes of action insofar as they seek to impress a trust on the west half of the Norris-Colgrove 1948 sublease in behalf of plaintiffs, or compel assignment to them, or the trusts of a beneficial interest, or additional beneficial interests therein, or to the entire acreage, or for damages for breach of an alleged agreement to so assign, are barred by the statutes of frauds of California as embodied in and by Civil Code, section 1624, subdivision 4; Code Civil Procedure, section 1971 and Civil Code, section 852, in that said alleged agreements are not in writing.

The causes of action attempted to be alleged for breach of, or for the specific performance of, the alleged contract of February 1948, not having been filed within four years of the alleged making thereof, are barred by the provisions of section 337, subdivision 1, of the Code of Civil Procedure.

The alleged contract of 1948 is, as to defendant Jennie Colgrove, the wife of C. W. Colgrove, and the remaining defendants, Janice Colgrove Whitehouse and Helen Colgrove Wilcox, their daughters, barred by the provisions of Civil Code, section 172a, in that the Norris-Colgrove sublease involved was at all times the community property of Colgrove and Jennie, she was not a written signatory to such alleged contract of 1948, and did not in writing authorize or empower Colgrove to enter into said alleged contract in her behalf.

For the reasons above stated, such four causes of action are barred as against Jennie and their daughters by the provisions of the above enumerated statutes of frauds.

The causes of action attempted to be alleged predicated on fraud, actual or constructive, are barred by the statute of limitations of California as embodied in and by the provisions of Code of Civil Procedure, section 338, subdivision 4, in that all facts constituting the alleged fraud were discovered by plaintiffs more than three years before date of filing the complaint herein.

For the same reasons insofar as the said causes of action attempt to allege a cause of action to set aside or impress with a trust an alleged fraudulent conveyance to the defendants other than Colgrove, they are barred by the provisions of the said Code of Civil Procedure, section 338, subdivision 4.

Plaintiffs' causes of action were not released by them nor were they estopped from asserting them nor was there an accord and satisfaction thereof.

Plaintiffs are not entitled to any relief by their third amended and supplemental complaint herein against any of the defendants, their causes of action alleged therein being barred by the provisions of the Civil Code and Code of Civil Procedure of California hereinabove quoted.

Appellants challenge the foregoing findings of fact and conclusions of law on the grounds that the evidence does not support them, they are conflicting, irreconcilable, and in some cases so unsupported as to constitute reversible error. They contend the evidence shows that at all times in question the relationship existing between plaintiffs and Colgrove was that of a fiduciary rather than one of confidential friendship, debtor and creditor or seller and buyer. That as a fiduciary, Colgrove had a duty to fully disclose all pertinent facts concerning their dealings and plaintiffs, in reliance upon that duty, had no duty on their part to investigate.

Plaintiffs further contend the gravamen of the causes of action in the instant case is the breach of the duty on the part of Colgrove, under the confidential relationship claimed as existing, to make a full disclosure of the facts pertaining to the discovery that his lease included the additional 80 acres. That defendants' breach is of a duty growing out of the contract, is ex delicto rather than ex contractu, and therefore, defendants being guilty of fraudulent concealment of the facts, the statute of limitations is deemed not to be operative until a period three years following discovery of the cause of action.

Whatever relationship may have existed between plaintiffs and Colgrove prior to February 1948, the court, on conflicting evidence, has found that during the period February to July, 1948, plaintiffs had constructive notice and commencing in July and by September 1948, had actual notice and knowledge of all pertinent facts claimed to have deceived or defrauded them. The court further found that through full knowledge of all the pertinent facts any relationship as between the parties of friendship or trust had terminated in April 1950.

It is clear then that if the record herein provides any substantial evidence to sustain these findings, the statute of limitations as provided in Code of Civil Procedure, section 338, subdivision 4, applies.

The rules here applicable are well stated in *Berniker* v.

*Berniker,* 30 Cal.2d 439, 444 [182 P.2d 557]: "It must be remembered that the trial court was face to face with the witnesses and had the opportunity to judge, from their demeanor on the stand and their manner of testifying, which of those giving positive testimony were worthy of credence.

■  As has so frequently been said, it is the general rule that on appeal an appellate court (1) will view the evidence in the light most favorable to the respondent; (2) will not weigh the evidence; (3) will indulge all intendments and reasonable inferences which favor sustaining the finding of the trier of fact; and (4) will not disturb the finding of the trier of fact if there is substantial evidence in the record in support thereof. [Citations.]  ■  It is not the province of the reviewing court to analyze conflicts in the evidence. [Citation.] Rather, when a finding of fact is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence contradicted or uncontradicted, which will uphold the disputed finding." (See *Primm* v. *Primm,* 46 Cal.2d 690, 693 [299 P.2d 231] ; *Estate of Arstein,* 56 Cal.2d 239, 240 [14 Cal.Rptr. 809, 364 P.2d 33] ; *Marshall* v. *Marshall,* 232 Cal. App.2d 232, 246 [42 Cal.Rptr. 686].)

The reporter's transcript on appeal herein contains 3,879 pages and hundreds of exhibits were offered by the parties and received as evidence. The trial court carefully detailed its findings of fact, including those relating to notice, discovery and knowledge on the part of plaintiffs of the facts relied upon by them as constituting fraud or deceit upon the part of defendants.

Some of these findings are in part as follows: At all times during the period of 1947 to 1950 plaintiffs knew or should have reasonably known or understood that Colgrove had, from a practical standpoint and effect, but one oil and gas sublease in the Cuyama Valley from Norris and that all acreage in excess of 80 acres was added and additional acreage subject to said sublease.

The only assignments made by Colgrove and his wife insofar as plaintiffs are concerned of any part of the 1947 or 1948 Norris-Colgrove sublease were of the east half thereof to trust numbers one and two and the west half to trust number three.

That at the time of the execution of the Norris-Colgrove 1947 sublease, Colgrove believed in good faith that the acreage subject thereto was approximately 80 acres. That between said time and prior to March 26, 1948, a survey, called the Fitzger-

ald survey, was made of the Cuyama Rancho. Prior to 1948 no official survey of the various interior section or external property lines of the rancho had been made. This 1948 survey showed that the parcel of ground covered by the Norris-Colgrove 1947 sublease contained approximately 160 acres. Colgrove learned of this on or about February 28, 1948.

The Norris-Colgrove 1948 sublease was executed to supplant the 1947 sublease and the acreage subject thereto was described by metes and bounds based upon the survey and included approximately 160 acres.

At all times in question until about May 15, 1948, plaintiffs and Colgrove knew and believed that the acreage which was the subject of the Norris-Colgrove sublease was unproven "wildcat" lands so far as the production of oil and gas were concerned.

On or about January 26, 1948, Colgrove sent a letter, addressed to "Dear Friends," to plaintiffs and to many other persons who throughout the prior years had advanced sums to and had been in various transactions with Colgrove. Thereby, as material hereto, Colgrove told plaintiffs that Norris had entered into a contract with Anderson for the development of Norris' holdings, Anderson to pay all costs of operations and one-half of the landowner's royalty so that Norris would receive 43¾ percent free from expense, the landowner receiving 12½ percent free from expense; that Anderson was willing to make the same deal with Colgrove "on my eighty"; that Colgrove had told one Hadley that he would make such a deal, providing they would move a rig in and start drilling and "keep drilling until four wells were producing on my eighty." This letter further indicated that Colgrove, in order to settle his indebtedness to all those who had loaned or advanced money to him through the preceding years, would transfer some percentage royalty to a trust with instructions to distribute the income to the various beneficiaries of the trust, each individual's interest to be worked out so that for each $1.00 owing there would be issued one unit. He asked that all his clients who desired the indebtedness so owed them to be settled in this manner to advise him.

On February 9, 1948, before the results of the Fitzgerald survey were known to him, Colgrove sent another letter, addressed "Dear Friends," to plaintiffs and others. Thereby, as material hereto, he told plaintiffs that he had "closed the deal on my 80-acres on terms just about as stated in my Jan. 26 letter. . . . The agreement calls for four wells on my eighty

to the present producing sand at 1900-ft, and it also provides that within 60 days after the completion of a producing well at the deeper zone within a distance of two miles from my eighty, they shall drill a well on my eighty to that deeper zone''; that Anderson's schedule was such as to provide for drilling a deep well ''on my eighty'' within six months; that he had heard from a majority of those receiving his January 26th letter and they were almost unanimous in their ''expressions in favor of receiving the royalty interest instead of taking their money back''; that the deal on the ''eighty'' being a closed transaction, he could describe the whole matter in questions and answers so as to give everyone a clearer understanding. There were eighty acres in Colgrove's lease; the discovery well was approximately 3,600 feet from Colgrove's eighty; that the Colgrove eighty was not in ''proven oil area'' until the ''bit proved it''; that Anderson had stated it was as good an eighty as there was in the field; that, in Colgrove's opinion, it was the best eighty in the field, as the structure rises to a high on this eighty; that under the lease to be made to Anderson, Colgrove would be left with a $41\frac{3}{4}$ percent overriding royalty, which meant that $41\frac{3}{4}$ barrels out of each 100 barrels produced ''on my 80 or the proceeds therefrom'' would be payable to him ''without any expense chargeable to it''; that he was assigning ''the entire $41\frac{3}{4}\%$ to the California Trust Company under a Trust Agreement'' whereby it would receive the proceeds and disburse to the beneficiaries ''named in that Trust Agreement'' that the beneficiaries would receive money ''each month as the production from the eighty is paid for''; that the beneficiaries of the trust would be himself and his wife from $15\frac{3}{4}$ percent out of the $41\frac{3}{4}$ percent, his children and grandchildren beneficiaries for 15 percent thereof, his secretary and her daughter beneficiaries for 1 percent ''and the other 10% out of the $41\frac{3}{4}\%$ will be paid to the Cuyama Syndicate . . . a trusteeship organization I am organizing for the benefit of my friends,'' which would ''be a common law trust with 150,000 ownership units'' which would be divided ''among those good friends who have 'played ball' with me over these past few years''; that the division thereof would be made by issuing one unit for every dollar that his said friends had ''put up with me in losing ventures''; that his estimate ''of the income to the Cuyama Syndicate . . . from its 10% royalty oil—10% of the total production from that eighty, is that it will amount to $50,000 to $250,000 per year''; that if the 150,000 units were

not taken under the plan they would be his and he would pay the difference out of the royalty proceeds that he would receive from his, his wife's and his children's beneficial interests, which he believed could be paid in six months; that those who put up cash and wanted cash would receive simple interest at 6 percent, but those who had put up cash and desired to take units should receive their profits from the units and not add interest; that his first objective was to get out of debt "morally and legally," and he believed "that eighty" would "ultimately pay out a profit better than ten for one for every dollar that has played ball with me and wants to continue in the game by taking the units as outlined."

Plaintiffs did not at any time until the filing of the complaint herein contend or claim to Colgrove that they were the beneficial owners of, or entitled to receive, together with others who had advanced or lent money to him, an undivided one-half of said Norris-Colgrove 1947 sublease or the Norris-Colgrove 1948 sublease; or that plaintiffs and each of said persons were legally or morally entitled to participate therein in the proportion that the moneys advanced by each bore to the total of the moneys advanced by all.

That said letters of January 26, 1948, and of February 9, 1948, are alleged by plaintiffs to be an offer, accepted by them, constituting a contract. That said alleged contract is the basis of the causes of action of the complaint.

On or about February 9, 1948, Colgrove sent a letter to Ventura requesting acceptance of his appointment as a trustee of Cuyama Syndicate. Ventura accepted.

On or about February 18, 1948, Colgrove sent a letter to plaintiff Fowler. Thereby, as material hereto, he stated that his records showed $5,580 owing to Fowler and suggested it be deemed $6,500; that there were indications that the first well on the eighty would "be started in next ten days"; that the prospects for quick drilling are good on the eighty.

At all times herein concerned and involved Ventura and Fowler lived in the same city; they were friendly; each knew of the moneys advanced and paid by the other to Colgrove; they exchanged with each other all information and gossip known to each so that all knowledge or information had by one was communicated to and had by the other.

On or about March 9, 1948, F. R. Anderson Associates (sometimes herein designated as "Anderson") and Colgrove entered into an agreement. Thereby, as material hereto, it was agreed that in order to obtain a correct legal description of

the ground which Colgrove leased under "the oil and gas lease rights by sublease from the Norris Oil Corp.," Anderson would quitclaim its rights obtained therein by the agreement of January 30, 1948; Colgrove would quitclaim the unrecorded Norris-Colgrove 1947 sublease; and Anderson would cause to be executed and delivered to Colgrove an oil and gas sublease on the land described in metes and bounds as therein set forth; the new sublease from Norris Oil Company to provide for the same royalty to be paid to the landowner, an overriding royalty to be reserved to Norris; that thereupon Anderson would execute with Colgrove another contract on the same terms as the January 30 agreement to cover the land therein described by metes and bounds, but to be subdivided into an east and west half thereof in two separate parcels with respect to drilling obligations; "which drilling shall be started on or before ninety (90) days from date"; that if the first well location be on the so-called "high ground" on the north part of the land, Colgrove would deposit the sum of $3,500 to be paid to Anderson in the event said well fails to produce oil in commercial quantity; Colgrove to quitclaim to Anderson 10 acres (square) around the proposed well location, and if Colgrove elected to deposit $8,500 instead of $3,500 "Dry hole money," the quitclaim to be redelivered to him.

On or about March 26, 1948, Norris, as lessor, and Colgrove, as lessee, executed an oil and gas sublease (sometimes hereinafter designated as Norris-Colgrove 1948 sublease).

Thereby, as material hereto, Norris sublet, being a sublease under Norris' lease dated the 20th day of October 1945, to Colgrove certain portions of the Cuyama Rancho, therein described in metes and bounds, and stating "contains 100 acres, more or less." In fact, under the Fitzgerald survey, the area of the land the subject of said oil and gas sublease was 160 acres. Colgrove believed and understood that it covered 160 acres. The legal description began at a point set by "Fitzgerald, registered Civil Engineer," and the document was recorded in the official records of Santa Barbara County. It likewise was recorded in the official records of San Luis Obispo County, the demised estate being situate in both said counties.

On or about said 26th day of March 1948, Colgrove and Jennie, called lessors, and Anderson, called lessee, executed an oil and gas sublease (sometimes hereinafter designated as Colgrove-Anderson east ½ sublease). The demised land was the

approximate east half, being approximately 80 acres, of the land demised to Colgrove under the Norris-Colgrove 1948 sublease. Said Colgrove-Anderson east ½ sublease was recorded May 26, 1948, in the official records of the County Recorder of San Luis Obispo County.

At the same time as the said Colgrove-Anderson east ½ sublease was executed the parties executed another oil and gas sublease. Thereby, there was demised to Anderson the approximate west half, being approximately 80 acres, of the land demised to Colgrove by the Norris-Colgrove 1948 sublease (said oil and gas sublease between Colgrove as lessor and Anderson as lessee is sometimes hereinafter designated as the Colgrove-Anderson west ½ sublease).

The covenants and conditions of the Colgrove-Anderson east ½ sublease and of the Colgrove-Anderson west ½ sublease are identical. The Colgrove-Anderson west ½ sublease was recorded May 26, 1948, in the official records of the County Recorder of San Luis Obispo County, and in July 1948 was recorded in the official records of the County Recorder of Santa Barbara County.

On or about April 6, 1948, Colgrove sent another letter, addressed to ''Dear Friends,'' to plaintiffs and others. Thereby, as material hereto, Colgrove stated to plaintiffs that Anderson had advised that he would start drilling on ''my land'' within three weeks; that ''some other developments occurred in the survey work in connection with the titles, which by virtue of boundary lines and maps delivered and a previous title described by extending government survey lines across the unsurveyed Cuyama Ranch, resulted in an increase in the acreage under lease to me, which increase I have put into a separate Trust in order to make it possible to bring good fortune to some other members of my family, if things turn out as they look''; that Anderson insisted on following ''the advice of their own geologists'' who had insisted ''upon cutting out a 10-acre square piece from my ground and letting them have it, especially in view of my increased acreage''; that Colgrove had met that ''by putting up $8,500.00 myself,'' to keep that 10-acres''; that it required ''setting up two trusts instead of one, so that my friends, during long years of losing efforts, would not have their interest diminished in any manner—so the 70-acres balance is in one trust as outlined before, and the 10-acres on which the well is to be started, is in the second trust''; that he had reduced the interests of himself and members of his family in the 10 acres to get the

$8,500; that "a new lease was issued" to him "on the acreage previously allotted—this new lease in accordance with the map of the previous allotment and described by metes and bounds—then new contracts were entered into between me and the Andersons, in order to replace the previous agreement pertaining to the drilling"; that by the new agreement with Anderson the next two wells to be drilled would be: the first on the 10-acre piece, and the second to be drilled immediately thereafter on the 70-acre piece.

That, thereby, plaintiffs were told and they did understand or should have reasonably understood that by reason of the survey work and the extending of the government survey lines across the unsurveyed Cuyama Rancho the acreage under the lease to Colgrove, referred to in his prior letters to plaintiffs, including those of January 26 and February 9, 1948, had been increased so that the land subject thereto was in excess of the 80 acres referred to in said prior letters; and that the increased acreage, the additional acreage, had been by Colgrove put into a separate and third trust for the benefit of Colgrove and other members of his family, and that neither plaintiffs nor the Cuyama Syndicate share or certificate holders thereof would participate therein.

Attached to the copy of said letter of April 6, 1948, sent to Fowler was a note that Colgrove had "scheduled a total of —6500— shares in Cuyama Syndicate to you, pursuant to my February letter."

Attached to the copy of said letter sent to Ventura was a note that he, Colgrove, had "scheduled a total of —25000— shares in Cuyama Syndicate to you, pursuant to my February letter."

On or about April 27, 1948, Colgrove sent another letter to plaintiffs and others, addressed to "Dear Friends." Thereby, as material hereto, he stated that "Mr. Norris, the largest stockholder in Norris oil, and 'Scotty'," his old friend and driller, also a large stockholder in Norris, came to his office "to find out if Anderson had conspired to help me get that added acreage I wrote about in the last letter"; that he had shamed them for trying "to grab more when a survey of the previously unsurveyed Rancho turned a little good luck in my direction by putting some extra acres into the area on which they had previously given me two maps."

On or about April 29, 1948, Colgrove sent another letter to plaintiffs and others. Thereby, as material hereto, he stated that he had told them of how he had saved the 10 acres on

which the first well was to be drilled by putting up $8,500; that he had three reasons therefor: The first, "It helped materially in settling the dispute over the added acreage I was getting"; second, he did not want "clients" cut out of this first well "any more than I wanted to be cut out myself"; third, it was cheap at $8,500; he offered 1 percent interests in said 10 acres for $1,250, each 1 percent to be a specific part of the "10-acre Trust, so that California Trust is to receive and disburse to the beneficiaries of that Trust, same as the other two, and same as Cuyama Syndicate, as to its 12% of this 10-acres"; that the potential oil producing horizons were the same on "all my ground in that field"; that he wanted plaintiffs to know of the deal and have the opportunity to take a unit if they desired, and requested them to advise if they wanted it and to forward their money; that he was sending the letter to only the four to whom it was addressed. A few days prior to May 1, 1948, Ventura advised Colgrove of his desire to purchase a 1 percent in said 10 acres. On or about May 1, 1948, Ventura mailed a letter to Colgrove enclosing the checks for the 1 percent and expressing his appreciation for the "25,000 shares allotted to me in the Cuyama Syndicate" and that he knew that Colgrove was basing it "on a most generous estimate"; that, however, it did not cover all of the moneys advanced or invested with or through Colgrove.

On April 10, 1948, Colgrove, his wife Jennie and their daughters, Janice and Helen, executed a "Declaration of Trust Number One." Therein, as material hereto, Janice and Helen declared that Colgrove and Jennie had conveyed and transferred to them as trustees, without consideration, their right, title and interest in and to the Norris-Colgrove 1948 sublease and the Colgrove-Anderson sublease insofar as it affected the particular lands therein described; that they would receive and collect the income and, after paying the landowner and Norris royalties, to disburse the income: 13¾ of the 41¾ to Colgrove and Jennie; 5/41 to Janice; 5/41 to Helen; 5/41 to one Harries K. Hebbard; 1/41 to Katheryne Johnston, Colgrove's secretary, and 12/41 to Hobart Brown, Treasurer, or his successor "as Treasurer, of the 'Cuyama Syndicate' a common law trust"; that the "Trustees shall designate the California Trust Company" or some other trust company to serve as their agent in collecting and disbursing the income.

The land therein described as approximately 70 acres of the

east one-half of the Norris-Colgrove 1948 sublease. The Colgrove-Anderson sublease therein referred to is the Colgrove-Anderson east ½ sublease.

On the same date, April 10, 1948, Janice and Helen, as trustees, and Colgrove and Jennie, as trustors, executed a "Declaration of Trust Number Two." Thereby, as material hereto, Janice and Helen, as trustees, declared that Colgrove and Jennie had conveyed to them, without consideration, the Norris-Colgrove 1948 sublease and the Colgrove-Anderson sublease insofar as it affected the lands therein set forth; the income, after payment of the Russell and Norris royalties, to be distributed and paid to the beneficiaries therein, to wit: 1/41-¾ to Ventura, 12/41-¾ to Hobart Brown, Treasurer, or to his successor "as Treasurer of the 'Cuyama Syndicate' a common law trust"; the trustees designated the California Trust Company to serve as their agent in the collection and disbursement of the income.

The land therein described is approximately 10 acres of the east half of the Norris-Colgrove 1948 sublease. The Colgrove-Anderson sublease therein referred to is the Colgrove-Anderson east ½ sublease. The land subject to the "Declaration of Trust Number One" and the "Declaration of Trust Number Two" is approximately 80 acres, and constituted the east ½ of the Norris-Colgrove 1948 sublease.

Said declaration of trust number two was recorded May 28, 1948, in the official records of the County Recorder of San Luis Obispo County.

Under date of May 11, 1948, a copy of said declaration of trust number two was sent to Ventura, and he was advised that the original had been filed for record, and the California Trust Company appointed the agent of the trustees as provided in paragraph 11 of the trust declaration.

On April 10, 1948, Janice and Helen, as trustees, and Colgrove and Jennie, as trustors, executed the "Declaration of Trust Number Three." Thereby, as material hereto, Janice and Helen declared that Colgrove and Jennie had conveyed and transferred to the trust, without consideration, their right, title and interest in and to the Norris-Colgrove sublease and the Colgrove-Anderson sublease insofar as it related to the lands therein described; that the net income was to be distributed, after payment of the royalties to the original lessor and Norris, to the beneficiaries therein set forth, being Colgrove, Jennie, Janice, Helen and other members of the Colgrove family; that California Trust Company was

appointed as the trustees' agent to receive and disburse the income.

The land therein described is the approximately 80 acres constituting the west ½ of the Norris-Colgrove 1948 sublease. The Colgrove-Anderson sublease therein referred to is the Colgrove-Anderson west ½ sublease.

On or about May 11, 1948, there was executed the " 'Cuyama Syndicate'—An Oil Royalty Trust.'' Thereby, as material hereto, the trustees acknowledged that they were the trust beneficiaries "of a certain twelve percent (12%) so-called overriding royalty oil interest from certain lands in San Luis Obispo County, California, which land and trust beneficial interest are fully described in the Declarations of Trust'' by Janice and Helen; that the trust should have a total capital of $180,000 divided into 180,000 shares of $1.00 each, to be issued to Colgrove or his nominees; the beneficial interests in said 12 percent royalty to be known as shareholders.

On or about June 7, 1948, Colgrove sent another letter to plaintiffs and others, addressed to "Dear Friends." Thereby, as material hereto, he stated that all Cuyama Syndicate papers are duly recorded; he had delayed ordering the certificate books until sure of favorable results; that they were in printing process and should be issued sometime that month; by postscript, he told Ventura that he would phone him when to come to California.

On June 19, 1948, Colgrove sent another letter to plaintiffs and others, addressed to "Dear Friends." Thereby, as material hereto, he stated that the Anderson Colgrove No. 1, the discovery well, had come in; that grading had been started on locations for another well on that part of the lease in which Cuyama Syndicate was interested; that he would soon pay off all "who have not assured me they wished to settle my account with them thru Cuyama Syndicate."

Anderson-Colgrove No. 1 well was in the 10 acres in which Ventura had purchased a 1 percent overriding royalty through the land being the portion of the Norris-Colgrove 1948 sublease and the Colgrove-Anderson east ½ sublease assigned to trust number two.

On or about June 24, 1948, Colgrove sent another letter to plaintiffs. Thereby, as material hereto, he told plaintiffs of an "O'Day" lease, "100 acres with a possibility it may be increased to about 170-acres by virtue of Rancho survey that resulted in the increase of acreage in my own lease recently."

On June 28, 1948, Colgrove sent another letter to plaintiffs

and others, addressed to "Dear Friends." Thereby, as material hereto, Colgrove stated: "Since my letter of a week ago Saturday, telling you of the well, Richfield Oil have moved another rig on that part of my lease in which Cuyama Syndicate has 12% royalty interest. . . . They moved the big rig with which they drilled the first well, to a location northwest, that put them on that portion of the lease in which only the Colgrove family is interested. . . . Payments will be made to the California Trust Company and in turn the California Trust Company will remit to the various beneficiaries of the Trust, of which Cuyama Syndicate is one beneficiary with 12%, or 12 bbls. out of each 100 bbls. free from all cost of operation. . . . More friends took the units than I thought would. In fact, I first proposed 150,000 units and 10% royalty, thinking I might have 50,000 units left for my ownership, just as stated in my long Question and Answer letter. However, I had to increase it to 180,000 units, so I took another 2% royalty out of Colgrove family and put it into Syndicate, so that the ratio would be the same—and they are all gone. For taxation reasons, I had to close the matter. I did all I could to sell the idea to everyone and I will do all I can to rush their cash investment, plus 6% interest, to those who wanted money instead of units, so that I will soon be able to say every dollar put up with old man Colgrove during the past 15 years of losses, is covered, either by a dollar plus interest, or many dollars of other value and I will be more happy about this than anyone else could be. Naturally, I will expect all of you who receive certificates to send me a receipt in full for all obligations."

On or about July 16, 1948, there was issued and delivered to Fowler certificate number 15 of Cuyama Syndicate for 6,500 shares.

On or about the 3d day of July 1948, there was issued and delivered to Ventura, sent to him under date of July 16, 1948, certificates numbers 86 and 87 of Cuyama Syndicate, each for 12,500 shares. Each of said certificates stated upon the face thereof: "The Cuyama Syndicate is designated as beneficiary for an interest equivalent to a 12% over-riding royalty income from approximately 80 acres of land in Cuyama Valley of San Luis Obispo and Santa Barbara Counties, California, pursuant to Declarations of Trust Number One and Two concerning oil and gas sublease by C. W. Colgrove to F. R. Anderson Associates, a limited partnership, and assignment thereof to the trustees named in said Declarations of Trust, all of record

in the County Recorder's office in said counties.'' The said certificates were sent to plaintiffs, by letter dated July 16, 1948, addressed to ''Cuyama Syndicate Dear Friends.'' Thereby, as material hereto, plaintiffs were told ''Enclosed herewith is your certificate for shares in the Cuyama Syndicate. As you will note on the face of the certificate, it participates in a 12% royalty on 80-acres of land. . . . There are two more wells with locations graded on the 80-acres in which Cuyama Syndicate is interested, both of which should be producing next month. . . . A new well on the Colgrove family part of the lease came in yesterday, and thereby created an offset location to the well in which Cuyama Syndicate is interested. This new well is reported as a 10,000 bbl. well and I will not be surprised to see one or more such big ones on the Cuyama Syndicate eighty acres soon. . . . I will appreciate your writing me on receipt of this report, acknowledging receipt of the Syndicate shares and advising therein that all my monetary obligations to you are paid in full.''

On or about July 21, 1948, Ventura executed and sent to Colgrove his receipt, stating: ''The undersigned acknowledges receipt of certificates for 25,000 shares of Cuyama Syndicate. Please be advised that all of your monetary obligations to me are paid in full.'' A like receipt was signed by Fowler.

In July 1948, pursuant to invitations from Colgrove, Ventura visited Colgrove in California. He personally went upon and viewed the acreage subject to the Norris-Colgrove 1948 sublease some three or four times. At these times he was told, and he, and Fowler through him, acquired additional knowledge that only Colgrove and the Colgrove family were interested and participating in and a beneficiary of trust number three; that said trust held the west half of the Norris-Colgrove sublease; and that neither plaintiffs nor Cuyama Syndicate nor trust number one, whereof Cuyama Syndicate was a beneficiary for 12 percent, nor trust number two, whereof Cuyama Syndicate was a beneficiary for 12 percent and Ventura a beneficiary for 1 percent, had any interest in, nor were or would perticipate in the said west half of said Norris-Colgrove sublease; that trust number three was an irrevocable trust; that the Norris-Colgrove sublease had been divided into two approximate halves, to wit, an east half and a west half; that said Cuyama Syndicate, he and said trust number one and trust number two were and would be entitled to participate in the east half of the said Norris-Colgrove sublease.

The record discloses Ventura testified on cross-examination

that at this July 1948 visit to the Cuyama Valley he was shown the east and west halves of the Colgrove lease and was told that the Cuyama Syndicate was participating in the east half only through trust numbers one and two, and the west half was in a Colgrove family irrevocable trust.

He further testified that Colgrove then told him, and he discovered for the first time, that Colgrove had this additional 80 acres adjoining the 80 acres to the east and that he and the Syndicate were not participating therein.

Colgrove testified that during the visit to the property in July 1948 he told Ventura in detail of the circumstances as to his discovery, following the survey, that his sublease from Norris encompassed 160 rather than 80 acres, including his difficulties in convincing Norris that this additional acreage was fully included in his 1947 sublease.

Ventura testified that during his visit in July 1948 Colgrove told him of his dispute with Norris Oil Company as to the added acreage to which he was entitled.

The court further found that neither Ventura nor Fowler made any objection to or protest against or claims contrary to any of said facts, notice and knowledge until during the year 1954.

On or about October 9, 1948, Colgrove sent another letter to plaintiffs, among others. He there stated: ''My contracts with Anderson Associates called for 41 3/3% [*sic*] royalty. These contracts were taken over by Richfield in their deal with Anderson. Very fortunately, I created three irrevocable trusts, covering this property, prior to the beginninf [*sic*] of actual drilling, last May, and generously divided it into various beneficial interests in favor of different members of my family and some others. . . . I do not care for any more money for Mrs. Colgrove and myself. A stroke of Fate has by the Trust provisions I set up, made millionaires out of every member of my family, including a brother and sister, and a good brother-in-law and sister-in-law. . . . Such is not the case, however, with my producing lease, as I tied that up forever in irrevocable Trusts.''

On or about February 8, 1949, Ventura read in a newspaper of an action filed by shareholders of Norris, claiming that officers thereof had re-leased the Russell Ranch property to Colgrove without authority, and praying for $3,000,000 in damages and the rescinding of its leases to Mr. and Mrs. Colgrove and Anderson, and stating further: ''The suit states that the Colgroves again leased the land to the Anderson

Associates on a 50-50 basis and that the latter turned it over to Richfield for a cash sum and 50 per cent of production.''

On or about February 10, 1949, Ventura wrote to Colgrove asking: ''Is there any basis for the suit filed by the Norris Oil Co.'s Stockholder to abrogate the agreements the Norris Oil Co. made with you in connection with your leaseholdings?'' On the same date of the receipt thereof, Colgrove wrote to Ventura stating: ''Nothing to worry about. Just a chiseler attempt. The Boundaries of my lease today are same as the Boundaries shown on map furnished me at time I made deal 4 years ago last month. Richfied isnt [*sic*] worried about it or they wouldnt [*sic*] have paid me the Royalty. Dont [*sic*] worry about it.''

Each of the letters sent by Colgrove to plaintiffs and Cuyama Syndicate certificate holders between August 2, 1948, and July 11, 1949, referred to the ''acreage'' or ''property'' or ''part'' or ''side'' or ''half'' of ''my'' or ''the'' lease in which Cuyama Syndicate was interested, and the Colgrove ''part'' or ''side'' or ''half'' and to trusts one and two.

On or about July 11, 1949, Colgrove sent another letter to plaintiffs and to the other persons who had become Cuyama Syndicate certificate holders. Thereby, as material hereto, he stated: ''It is only common sense to realize that experience in the development of an oil field counts heavily, as in anything else. Experience has developed that the eastern edge of the 'Dibblee Sand' the one that came in first, to be in the east half of my lease—the half Cuyama Syndicate is interested in. Why did I put the Cuyama Syndicate into the east half instead of the west half? Answer: because the first well was located on the east half and I wanted to put you in the first well. I held up final closing of the Trust papers until the location of the first well was definitely determined. Then—I put you into that half to give you the best break I could. No one could have possibly said at that time that the west half would turn out better—in fact, although it is temporarily sure the west half is better—yet it may soon prove to be that the east half is better than the west half''; that Anderson had written to Richfield, on or about June 18, 1948, in which he stated, among other things, that Colgrove ''expressed his understanding of Richfield's and Anderson's position, but went on to explain that, due to diversity of interest in the two Colgrove leases, he felt a personal obligation to his friends to see that this well be drilled. Mr. Colgrove stated that he would be willing to have the well bottomed extremely close to

the west line in order to insure production and would forfeit his personal 13¾% royalty interest in said well until such time as the 13¾% royalty paid for the well in full''; that he, Colgrove had received a Cuyama field map with his regular daily Munger Oil Field Service report; that he had procured a few extra copies and enclosed one with the letter sent to plaintiffs; that the map would serve ''to emphasize a few points by reference thereto as follows: 1st. my lease divided into East and West half and colored, shows (a) the wells, (b) the productive area of it from Dibblee zone in red and the edge area in green, (c) the narrow limitations of the Colgrove zone, which is the deeper zone. . . . Now, to the question—is it possible the East half will out-produce the West half? . . . but they are hoping to open up the big Vaqueros Sand, I am told at about 6500-ft depth and my geologist, Dave Bickmore, thinks it will be found—found productive and that it will extend west to cover ¾ths of the East half of my lease—the half you are interested in—with possibly one location in the northeast corner of the West half.'' He concluded: ''You may continue your confidence in me personally, with full knowledge that I always have and always will serve you faithfully, to the utmost of my ability.''

The Munger oilogram sent to and received by plaintiffs was dated June 18, 1949, and is in evidence. Its pictorial effect is factually informative.

On or about August 1, 1949, Colgrove addressed another letter to plaintiffs. Thereby, as material hereto, he stated: ''. . . I could not sell any of the royalty I had owned as I had already—before the well was ever started—assigned it all in the creation of certain irrevocable Trusts, in the hopes that it would afford unassailable security to my family and some of my loyal friends who helped me, and also afford me the great pleasure during the balance of my life, of observing their pleasures from its probable income. In this procedure I also created the Cuyama Syndicate and made it a 12% royalty beneficiary from part of the lease. It was organized with 180,000 units, which were distributed without cost, to friends who had 'played ball' with me in part of the 17 dry holes I had previously drilled and this 12% royalty has been paying them 4% and 5% monthly dividends on those prior losses. . . . The royalty interest I put into trust has been variously estimated to have a value up to $20,000,000. In my opinion it will produce at $2.00 oil (price now $2.50) from twenty to fifty million dollars to those trusts. In one year it has pro-

duced over $1,000,000 to my immediate family, with all wells curtailed to a small fraction of their potential. . . . However, I assure you all that by the time Christmas rolls around this year, I will not owe a dime of that loan and that I will pay off the mortgage on my home and on my car, and that I won't owe you good people a red penny of that money you have so generously sent me—in other words, for the first time in 40 years I will be out of debt—and from then on out, I intend to stay out of debt.''

In April 1950, a meeting was held in Chicago, Illinois, between Colgrove and plaintiffs and other persons residing in or near Chicago who were Cuyama Syndicate certificate holders. During the course of that meeting, bad and hard feelings were caused between Colgrove and plaintiffs. From that time on, no further trust or confidence was reposed by plaintiffs, or either of them, in Colgrove.

At said meeting and as a result thereof, during said month of April 1950, plaintiffs became suspicious of, and began to believe they had been wronged by the actions, motives, reasons and purposes of Colgrove in the division of the property, the subject of Norris-Colgrove 1948 sublease, into an east half and a west half; the non-participation by Cuyama Syndicate and them in the west half of the property subject thereto; Cuyama Syndicate's and their participation only in trust number one and trust number two but not in trust number three.

That by reason thereof, plaintiffs, and particularly Ventura, commenced an investigation into all of the facts and circumstances to determine and conclude if an action could be instituted and maintained against Colgrove so that Cuyama Syndicate and he and Fowler through it and he through trust number two could participate in the west half of the Norris-Colgrove sublease. Ventura, shortly thereafter, consulted a lawyer, his cousin. That lawyer referred him to Albert J. Ryan, then a member of the State Bar of California. Ventura and Fowler were from and after said time represented by counsel. The within action was filed June 24, 1954.

That prior to July 1948 plaintiffs had notice of circumstances sufficient to put a prudent man upon inquiry, and by July 1948, had actual notice that Colgrove at all times had, in effect, one and only one sublease from Norris; that the Colgrove-Norris sublease was in fact of 160 acres and not 80 acres; that Colgrove had not paid any additional sums or consideration therefor; that the lands subject to the lease had been divided into an east half and a west half; that plaintiffs

and Cuyama Syndicate were interested in, and only had beneficial interests in, the east half through trust number one and trust number two, and had no interest in the west half, which had been placed in trust for the benefit of Colgrove and his family; and that the one 1948 sublease from Norris was a substitute for and a replacement of the Norris-Colgrove 1945 sublease and the Norris-Colgrove 1947 sublease.

That Ventura, and his transferees of the Cuyama Syndicate shares, and Fowler have received, since the issuance of said shares, various dividends declared from time to time. Ventura and his assignees have received in excess of $78,000. Fowler has received in excess of $20,000.

That from and after the month of July 1948, Ventura advanced, lent and paid in connection with various other oil well drilling projects of Colgrove, both in the Cuyama oil field and elsewhere, various sums of money aggregating approximately $25,000.

Thereafter, in the year 1951, after various of said oil well drilling projects had been abandoned as failures, Ventura asserted a claim against Colgrove to the effect that Colgrove was obligated, under an alleged personal guaranty, to repay said sums to Ventura, together with interest. Thereupon, a dispute arose as to certain phases of said claims. The dispute was the subject of discussions and negotiations, including negotiations between legal counsel for said parties. It was settled by a compromise agreement, executed by said parties under date of February 23, 1952. Pursuant thereto, Colgrove agreed to pay to Ventura, and he did pay to him, the sum of $26,510. Ventura agreed to and he did accept said sum in full settlement of said dispute and of all rights and claims of every kind which he then had or claimed against Colgrove, excepting only such rights, claims or demands as he might then have or claim to have in connection with the Cuyama Syndicate.

Neither Ventura nor Fowler has rescinded, or attempted or purported to rescind, the transaction represented by the issuance unto each of them of shares of Cuyama Syndicate. Each has accepted and retained the benefits thereof. No fiduciary relationship existed between plaintiffs, or either of them, and Colgrove or any other defendant at any of the times herein involved. That, as distinguished from a fiduciary relationship, a confidential friendship, one of trust and confidence reposed by plaintiffs in Colgrove, voluntarily sought and accepted by him, had existed between plaintiffs and Colgrove during the

period from on or about 1938 to on or about April 1950. That from and after April 1950, neither plaintiff was a friend of or reposed any trust or confidence in Colgrove.

The alleged contract between plaintiffs and Colgrove in February 1948 did not of and by itself create a trust or fiduciary relationship between plaintiffs and Colgrove, or fiduciary duty on his part to them.

That any failure or omission by Colgrove, prior to the issuance and delivery to plaintiffs in July 1948 of the Cuyama Syndicate shares, to expressly advise plaintiffs that the Norris-Colgrove 1947 sublease had been supplanted and replaced by the Norris-Colgrove 1948 sublease; that the sublease covered 160 acres, rather than 80 acres; and that he, Colgrove, had not paid any additional sum or consideration therefor; that he had entered into the said two subleases with Anderson, to wit, the Colgrove-Anderson east ½ sublease and the Colgrove-Anderson west ½ sublease, whereby he had divided the property, subject to the Norris subleases, into an east half and a west half; and that Cuyama Syndicate and plaintiffs were participating in and beneficiaries only of the east half and were not participating in or beneficiaries of nor interested in nor entitled to any benefits from the west half; that he had assigned only the east half of the Norris-Colgrove 1948 sublease to trusts numbers one and two, and had assigned the west half thereof to trust number three; that neither plaintiffs nor Cuyama Syndicate were beneficiaries of trust number three; and that only Colgrove and his family were participating in and beneficiaries of and had beneficial interests in the west half, was not intentionally or knowingly done or omitted by Colgrove to deceive or defraud plaintiffs or either of them or to induce them to enter into the alleged contract of 1948. That Colgrove's said acts and omissions were not intentionally done or suppressed by him, or calculated, or fitted by him to deceive or to mislead plaintiffs, or either of them, to their prejudice.

That at the time of the entering into of the Norris-Colgrove 1947 sublease and the Norris-Colgrove 1948 sublease until after May 15, 1948, Cuyama Valley area was, from a standpoint of its oil, gas and other hydrocarbon possibilities and potential, extremely speculative and known in the oil producing industry and to plaintiffs and Colgrove as a "wildcat" area. At the time early in May 1948 when Colgrove caused the west half to be assigned and transferred to trust number three Colgrove had no knowledge or belief or reasonable cause or

grounds or information to know or believe that either of the halves of said Norris-Colgrove 1947 or 1948 sublease was more valuable or more probable to produce oil, gas or other hydrocarbon substances than the other. Colgrove did not then know or believe or have any reasonable cause or grounds or information to know or believe that the west half of said Norris-Colgrove subleases would ultimately produce more oil or gas or other hydrocarbon substances than the east half. That the reasons and purposes that motivated Colgrove and caused him to make Cuyama Syndicate a beneficiary of the east half, all as hereinbefore found, were in good faith and believed by him in good faith to be for the best interests of plaintiffs and said Cuyama Syndicate.

At all times herein concerned plaintiffs and each of them were adults, intelligent, and experienced in business affairs; and each was fully capable of understanding and appraising all of the facts and statements made by Colgrove to them, all as hereinbefore found.

At all times herein concerned, including the period of time prior to plaintiffs' acquiring actual notice and knowledge thereof, plaintiffs had available to them means and had the financial ability to cause an investigation to be made and to acquire actual and express knowledge of all of the facts hereinbefore found.

At no time from 1947 to the time of trial hereof did Colgrove or any of the defendants do anything whatsoever, other than the statements and representations hereinbefore expressly found, to prevent plaintiffs, or either of them, from making any investigation they might desire to ascertain any or all of the facts herein found. During all of said period of time, Colgrove fully and fairly answered all inquiries by plaintiffs and each of them regarding the Cuyama Valley oil field, the Norris-Colgrove subleases, the Colgrove-Anderson subleases, and all other matters inquired of by plaintiffs, or either of them. No representations whatsoever were made to plaintiffs, or either of them, by Jennie, Janice, or Helen. None of said defendants participated in any way in the alleged negotiations for, or representations as to or otherwise in, the alleged contract of 1948, claimed to have been entered into between plaintiffs and Colgrove.

We have examined the extensive record herein and are of the opinion that there was substantial evidence, considered in connection with such inferences as the trial court could reasonably draw therefrom, to sustain each and every material finding of fact upon which the judgment is predicated.

■ The trial court properly concluded that so far as the third amended and supplemental complaint of plaintiffs' alleged causes of action for breach of, or for specific performance of the alleged contract of February 9, 1948, they are barred by the provisions of Code of Civil Procedure, section 337, subdivision 1, in that they were not filed within a period of four years from date thereof.

■ The evidence herein fully supports the findings and conclusions of the court that, insofar as plaintiffs' causes of action are predicated upon alleged fraud, either actual or constructive, they are barred by the provisions of Code of Civil Procedure, section 338, subdivision 4, in that all facts constituting the alleged fraud were discovered by plaintiffs more than three years before date of filing the complaint herein.

■ Likewise, the findings and conclusions that plaintiffs' causes of action, in light of the evidence, do not meet the requirements of Civil Code, sections 1624, subdivision 4, 852 and 172a, and Code of Civil Procedure, section 1971, are amply supported by the record herein.

The judgment is affirmed.

Wood, P. J., concurred.

FOURT, J.—I dissent.

The defendant C. W. Colgrove in this case was a graduate of the University of Minnesota and a lawyer who invariably referred to the plaintiffs in this case as his clients. Of the plaintiffs, one had a grammar school education and the other had attended high school. One was a printer and one was a clerk in a public utility in Chicago. Plaintiffs had sent to Colgrove at his request considerable sums of money from their earnings, with which he was to purchase oil leases and an oil rig. Great trust and confidence were placed in Colgrove by plaintiffs. Colgrove went broke in a patent-medicine venture and reported to his clients that by an order of a federal judge he had been put out of the business of marketing his patent medicine and that he was going to retire from the business; that he was going to take an oil lease and would set aside 10 acres out of an 80-acre parcel for the benefit of the plaintiffs. He never told the plaintiffs that he had purchased the lease with the money they had advanced to him for the oil rig. There was a variance in the survey of the land to be leased and it was learned by Colgrove that there was within the area which he had leased 160 acres instead of 80 acres. Colgrove

failed to advise the plaintiffs of the difference. Colgrove wrote many letters to plaintiffs which disclose clearly that he was guilty of the most flagrant fraud. Colgrove had every advantage over plaintiffs, he knew the facts and he knew that the property in question was worth millions; the plaintiffs trusted Colgrove implicitly and had no firsthand knowledge of the facts.

The plaintiffs accepted as authentic the fraud of Colgrove and the statute of limitations should not start to run until the time at which the plaintiffs discovered the facts; it should make no difference whether it was 4 or 40 years. The right to trust is as important as the duty to disclose. Colgrove did not tell plaintiffs that he got 160 acres instead of 80 acres, that he had paid no consideration, that he had divided the lease into two halves and placed plaintiffs into only a part of one of the halves and that he had taken the other half to himself. True it is that the trial court apparently found that those things were not done intentionally by Colgrove to deceive or defraud. However on the face of it and the record bears it out, the conduct of Colgrove in almost his every act was patently designed to deceive and mislead. To hold otherwise is to whitewash duplicity and fraud.

In short this is a case where Colgrove, an attorney, now relies upon the statute of limitations because he claims in effect that his clients did not investigate soon enough, although the clients were led to place their trust and confidence in Colgrove and by his actions, in effect, were slow in determining what a monstrous piece of duplicity and fraud he really had practiced on them.

To affirm the judgment in this case is legalism run riot and makes for a travesty of justice. Laymen might well wonder whether courts protect those (and particularly attorneys) who have made a shambles of the truth or do they protect those who have a cause of action because of the fraud and deceit which has been practiced against them.

I would reverse the judgment and ventilate this case with a little fresh air.

A petition for a rehearing was denied March 26, 1969, and appellants' petition for a hearing by the Supreme Court was denied April 23, 1969.