CADDO OIL CO., INC.,
Plaintiff–Appellant
Cross–Appellee,

v.

M.J. O'BRIEN and F.M. O'Brien,
Defendants–Appellees
Cross–Appellants.

No. 89–4369.

United States Court of Appeals,
Fifth Circuit.

Aug. 13, 1990.

14

Wm. Paul Lawrence, II, Frank H. Spruiell, Jr., Comegy's, Lawrence, Jones, Odom & Spruiell, Shreveport, La., for plaintiff-appellant cross-appellee.

Robert U. Goodman, John M. Frazier, Kennedy, Goodman & Donovan, Shreveport, La., for defendants-appellees cross-appellants.

Before GEE, POLITZ, and BARKSDALE, Circuit Judges.

GEE, Circuit Judge:

*Facts and Prior Proceedings:*

Mr. O'Brien acquired an interest in the Muslow KA, KF, and KJ leases in Caddo Parish, Louisiana, from Donald A. Raymond, Jr., chief executive officer and director of Caddo Oil Company, Inc. (the "Lerner Deal"). More than twenty years later, O'Brien increased his interest in the leases to 13.33% by joining with Raymond in a partition of the original leases with other of their co-owners.

In 1967, the time of O'Brien's initial investment, Caddo was orally designated as operator of the Muslow leases. A written operating agreement was entered into in 1975. Caddo served as operator of the Muslow leases until September, 1984, when he resigned. The Operating Agreement provides that operating expenses of the Muslow leases be allocated on a district-wide basis and requires O'Brien's consent for additional development, drilling, or abandonment of wells.

On New Year's Day 1976, one year after the Operating Agreement was entered into, Caddo proposed to charge operating expenses for the Muslow leases on a fixed rate basis and began charging $90 per well per month. Over time the rate was periodically increased. From January, 1976, until June, 1980, O'Brien paid the $90 per month fee. O'Brien discontinued his payments in June, 1980, owing to problems he was having on another deal (the "Burleson–Milam Deal) through which he and a number of his close friends and business associates had invested with Raymond and Caddo.

Between June, 1979, and December, 1981, Caddo drilled and completed seven additional wells on the Muslow leases. Caddo billed O'Brien for his pro rata share of the costs and expenses for development of the seven additional wells. O'Brien refused to pay the expenses and claimed at trial that he had not consented to the drilling of those wells. O'Brien did, however, receive production revenues from the seven wells.

In March, 1985, Caddo perfected a lien against the interests of O'Brien in the Muslow leases. In April, 1986, Caddo sued Mr. and Mrs. O'Brien seeking damages for the provision of materials and performance of services in connection with the operation of the oil and gas leases under the Lerner and Burleson–Milam Deals. Mr. and Mrs. O'Brien removed the case to Federal Court, where they answered and filed a counterclaim alleging, as to the Burleson–Milam Deal, fraud and that the amounts already paid Caddo exceeded the value of services rendered, and, with respect to the Muslow leases, seeking an offset of his counterclaims against Caddo's charges.

Caddo filed a Rule 12(b)(6) motion to dismiss O'Brien's counterclaim on the ground that limitations had run. Caddo's motion was converted into a motion for summary judgment and granted in part, but otherwise denied on the ground that there existed a fact question as to when O'Brien knew or should have known of the alleged fraudulent activity. Then, O'Brien filed a motion to dismiss or, in the alternative, a motion for summary judgment, seeking dismissal of Caddo's original claims arising out of the Burleson–Milam Deal, on the ground that limitations had run. In response, Caddo filed a cross-motion for summary judgment, again seeking dismissal of O'Brien's counterclaim in connection with the Burleson–Milam deal. The district court granted the motions for summary judgment as to the Burleson–Milam Deal.

On the eve of a bench trial, O'Brien raised, as a defense to the Muslow lease claims, that he had paid Caddo rates for lease operations that exceeded the rates established in the Operating Agreement. At a pretrial conference the trial was bifurcated. Phase I was held to determine the terms of the Operating Agreement and whether there had been any modifications thereto. The district court concluded that the Operating Agreement should be construed to afford a presumption of correctness to all charges billed by Caddo to O'Brien in connection with the Lerner Deal leases and that it was unnecessary to de-

cide whether the agreement had been amended.

The issue left for Phase II of the trial was whether O'Brien could rebut the presumption of correctness of Caddo's billings by proving fraud in the execution or breach of contract. Ultimately, the district court granted judgment in favor of Caddo for $47,746.00, representing operating expenses due in connection with the Muslow leases under the rates set forth in the Operating Agreement. The district court denied recovery to Caddo for any increased operating expense rates and for costs of drilling the additional seven wells. It further denied the O'Briens' counterclaim and third party demand. Caddo appeals. Mr. and Mrs. O'Brien cross-appeal.

*Discussion*

*Caddo Appeal*

1. Consent to drilling seven additional wells

■ Despite the Operating Agreement's requirement of his consent for additional development, the district court found that O'Brien had not consented to the drilling of the seven additional wells on the Muslow leases and, therefore, that O'Brien was not liable to Caddo for his share of the development costs. Caddo argues that, although O'Brien did not give written consent, his knowing receipt and acceptance of production revenue from the seven wells was tantamount to consent and obligates O'Brien to pay his pro rata share of the expenses.[1]

Caddo makes much of the fact that O'Brien and Raymond spoke daily and discussed the new wells in several exchanges of correspondence. In the first of this series of letters to Raymond, O'Brien did say that he was not in favor of spending any additional money on developing the Muslow leases. In subsequent letters, however, O'Brien inquired about when the proposed wells would pay out, interposing no further objections to drilling. Raymond died before trial and evidence of his conver-

sations with O'Brien was thus rendered inadmissible.

Caddo suggests that even if O'Brien's consent to the drilling was not express it was, at the very least, implied. Or, put another way, Caddo maintains that as a matter of law O'Brien is deemed to have consented to the development of the wells by reason of his having accepted production revenue from the wells.

The district court found that it was the practice of Caddo to obtain consent to development in writing. In fact, Caddo sought O'Brien's written consent by letter prepared with a signature line for O'Brien to sign and return in the event that he consented to the development. O'Brien did not sign the letters, nor did he impliedly consent to the development by silence or otherwise. Caddo cannot force O'Brien to invest in wells in which he does not wish to invest and to the drilling of which he did not consent. The district court did not err in finding that there was no implied or tacit consent.

2. Consent to increases in monthly operating fee

■ The district court further found that O'Brien did not consent to increases in the monthly fixed rate operating expense fees. There is no dispute that O'Brien consented to the $90 per well per month fee. Only the subsequent increases in the monthly fee are at issue here.

Here, the parties rely primarily on their arguments under issue 1. As they indicate, the inquiry is essentially the same. Having gone through it again, we are convinced that O'Brien did not consent to any increase in the per well per month fee. Once again, therefore, the district court was correct.

■ Further, O'Brien did not ratify any subsequent increase in the monthly fee. The Operating Agreement does provide that:

1. The district court found that Caddo had not adequately proved that O'Brien received revenue from the specific wells at issue. This finding is not clearly erroneous, particularly in light

of the fact that all of the production from the various Muslow lease wells was stored in a single tank.

Payments by Owner of statements furnished by Operator in connection with the management and operation of said properties shall constitute full acknowledgement, ratification and approval by Owner of the action taken by Operator in the premises.

Nonetheless, because O'Brien never paid any more than the original $90 per well per month fee, it cannot be said that he ratified any of the subsequent increases. The judgment of the district court awarding damages in the amount of $47,746.00, representing operating expenses due in connection with the Muslow leases under the operating expense rates set forth in the original Operating Agreement, is correct.

*O'Brien Cross–Appeal*

1. Laches

O'Brien argues that the trial court erred in denying his affirmative defense of laches. As he states, Caddo "slumbered on its rights, and thus forced O'Brien to defend at a time when the recollection of all is no longer fresh, and when the most probative witnesses for Caddo are no longer alive."

▉▉▉ This action is governed by a ten-year prescriptive period. Caddo filed suit one year and six months after its resignation as operator of the Muslow leases and five years and ten months after O'Brien had stopped paying on his lease operation and development accounts—well within the prescriptive period. That being so, the doctrine of laches is inapplicable. And, even if it were to apply, O'Brien has not shown any undue or inexcusable delay by Caddo in asserting its rights, nor has he demonstrated any undue prejudice. The district court did not abuse its discretion when it refused to apply the affirmative defense of laches to bar this suit.

2. Attorneys' Fees

▉▉▉ O'Brien next maintains that the district court erroneously awarded attorneys' fees because the sum sought by Caddo was incorrect—different from the amount awarded. O'Brien relies on the Louisiana Open Account statute. His reliance is misplaced. This case does not involve a suit upon an open account and the Louisiana Oil, Gas and Water Well Lien Statute does not require, in order to recover attorneys' fees, a written demand for payment correctly setting forth the amount owed. The district court's award of attorneys' fees was proper.

3. Presumption of correctness of Caddo's billings

▉▉▉ O'Brien argues that the district court erred in finding that Caddo's billings were entitled to a presumption of correctness. O'Brien was given ample opportunity over the course of his dealings with Caddo to audit Caddo's records. He never did so. Further, the charges for which Caddo sought recovery from O'Brien represent fixed costs—the costs of drilling and completing seven specific wells and fixed rate, per month per well, operating charges. There was no error here.

4. Fiduciary duty

▉▉▉ O'Brien next suggests that Caddo, as operator, owed a fiduciary duty to O'Brien, as owner, and, this being so, that Caddo had a duty to provide O'Brien with a full accounting. O'Brien is incorrect. Caddo was under no duty to provide O'Brien with an accounting. Rather, the onus was on O'Brien to conduct an audit if he believed one necessary. Under the terms of the Operating Agreement, the Operator is liable to the Owners only in cases of the Operator's willful misconduct. The terms of the Operating Agreement control, and Caddo's actions are to be judged by a prudent operator standard, not by that of a fiduciary.

5. Statute of Limitations

▉▉▉ O'Brien argues that Caddo's claim is based upon an open account and is, therefore, governed by a three-year prescriptive period. A suit to recover amounts due under a written operating agreement is a suit in contract, not a suit on an open account. A written operating agreement remained in place at the time suit was filed, and this action is governed by a ten-year

**18**

prescriptive period. The suit, therefore, is not time-barred.

The judgment of the district court is AFFIRMED.