[No. F042031. Fifth Dist. Mar. 23, 2004.]

ARMSTRONG PETROLEUM CORPORATION, Plaintiff and Respondent,
v.
TRI-VALLEY OIL & GAS COMPANY, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II of DISCUSSION.

1376

COUNSEL

Law Offices of Lynch and Lynch and Craig M. Lynch for Defendant and Appellant.

Mayer, Brown, Rowe & Maw, Gregory R. McClintock and Brian E. Wall for Western States Petroleum Association as Amicus Curiae on behalf of Defendant and Appellant.

Noriega & Bradshaw and Donald C. Oldaker for Plaintiff and Respondent.

OPINION

DAWSON, J.—After a bench trial, the superior court ruled an operator breached its obligations under an oil and gas operating agreement. The operator appeals, claiming that the breach of contract claim was barred by the statute of limitations in subdivision 1 of section 337 of the Code of Civil Procedure,[1] and that lay testimony essential to the calculation of the amount of damages was based on hearsay evidence and was inadmissible. The operator asserts the breach of contract cause of action accrued when it rejected in writing the nonoperator's interpretation of how to calculate its net revenue interest under the contract.

In the published portion of this opinion, we hold that the monthly payments and deliveries made to the nonoperator for its net revenue interest in oil and gas production were divisible from one another and, therefore, the claims relating to monthly performance occurring within four years of the time of filing the complaint were timely. In the unpublished portion of this opinion, we hold that substantial evidence supports the trial court's findings as to the amount of damages resulting from the breach of contract. Accordingly, the judgment will be affirmed.

## BACKGROUND

*DEFINITIONS*

Because the terminology used in oil and gas cases is inexact and can vary in meaning depending on context, we begin by setting forth some basic definitions relevant to this case. Caution should be used in applying these definitions in contexts beyond that presented here. (See *Lynch v. State Bd. of*

---

[1] All subsequent statutory references are to the Code of Civil Procedure unless otherwise indicated.

*Equalization* (1985) 164 Cal.App.3d 94, 99–103 [210 Cal.Rptr. 335] [discussing inexactness of terminology in oil and gas context and recognizing terminology is not totally definitive of the rights involved].)

A "working interest owner" is the owner of an equity interest, and that interest is distinct from a royalty interest or a net profit interest. (McArthur, *Judging Made Too Easy: The Judicial Exaggeration of Exculpatory and Liability-Limiting Clauses in the Oilfield's Operator Fiduciary Cases* (2003) 56 SMU L.Rev. 925, 926, fn. 1.)

"Working interest" means the exclusive right to enter the land to explore, drill, and produce oil and gas from the land and to take title to the oil and gas produced. Usually this bundle of ownership rights is created by an oil and gas lease that carves out and transfers the bundle from a larger bundle of ownership rights held by the lessor. In some contexts, "working interest" is synonymous with "operating interest" and "operating rights," but in this case we will use the terms "operating interest" and "operating rights" to mean the rights held by the "operator" pursuant to the terms of the "operating agreement" entered into by the owners of the working interest. A working interest, unlike a royalty interest, is burdened with the cost of development and operation of the property. (8 Williams & Meyers, Oil and Gas Law (2003) Manual of Oil & Gas Terms, pp. 1191, 730, 731, 623 [summarized from definitions of "working interest," "operating interest," "operating rights" and "mineral interest"].)

"Royalty interest" means a property interest created in oil and gas; its owner "is entitled to a share of production, if, as and when there is production, free of the costs of production." (8 Williams & Meyers, Oil and Gas Law, *supra*, p. 952.) This interest can be held by the lessor under an oil and gas lease or can be created by another type of instrument. (*Ibid.*)

"Operator" in its broadest sense means a person engaged in the business of drilling wells for oil and gas. (8 Williams & Meyers, Oil and Gas Law, *supra*, p. 733.) For purposes of an operating agreement, the operator holds the right to explore, drill, and produce oil and gas from the specified tract of land to the extent provided in, and subject to the restrictions of, the operating agreement. This collection of rights shall be referred to as the "operating rights" for purposes of this decision.

"Operating agreement" means an "agreement between or among interested parties for the testing and development of a tract of land. Typically one of the parties is designated as the operator and the agreement contains detailed provisions concerning the drilling of a test well, the drilling of any additional wells which may be required, the sharing of expenses, and accounting

methods. The authority of the operator, and restrictions thereon, are spelled out in detail in the typical agreement." (8 Williams & Meyers, Oil and Gas Law, *supra*, p. 728.)

"Nonoperating working interest" means the working interest, or a part of the working interest, from which any operating rights have been separated by the terms of an operating agreement. (8 Williams & Meyers, Oil and Gas Law, *supra*, p. 686.)

"Net revenue interest" may mean a variety of things. (See 8 Williams & Meyers, Oil and Gas Law, *supra*, pp. 666–667 [enumerating four definitions].) Generally, it means "[t]hat percent of the production revenue allocated to the working interest after first deducting proceeds allocated to royalty and overriding interest." (The Oil & Gas Resource Center, Definitions <http://www.oil-n-gas.com/definitions.shtml> [as of Mar. 18, 2004].)

"Payout" occurs when the costs of drilling and equipping a well have been recovered from the production. (8 Williams & Meyers, Oil and Gas Law, *supra*, p. 769.)

## FORM AGREEMENTS IN OIL AND GAS INDUSTRY

Respondent Armstrong Petroleum Corporation (Armstrong) and appellant Tri-Valley Oil & Gas Company (Tri-Valley) expressed a portion of their contractual relationship using preprinted form agreements common in the oil and gas industry in the United States. Background information on those forms is set forth below.

### A. AAPL Form 610

The operating agreement between Armstrong and Tri-Valley was set forth on the version of the American Association of Petroleum Landmen (AAPL) Form 610 Model Form Operating Agreement (Form 610) issued in 1989. Form 610 has been used widely in the oil and gas industry since the first version was prepared in 1956; it often is called a joint operating agreement or simply JOA. (Reeves & Thompson, *The Development of the Model Form Operating Agreement: An Interpretative Accounting* (2001) 54 Okla. L.Rev. 211, 213; see Hart, *Recent Developments in Oklahoma Oil and Gas Law* (2003) 56 Okla. L.Rev. 449, fn. 2, and article cited therein [Form 610 used extensively in domestic multiple-party ventures for the on-shore drilling of gas and oil].)[2]

---

[2] The amicus curiae brief filed by the Western States Petroleum Association asserts that versions of Form 610 have been used throughout California.

Form 610 is entered into by the owners of the working interest to coordinate the testing and development of a tract of land by designating an "operator" and specifying each working interest owner's rights and obligations throughout the development and production process. (Pierce, *The Law of Disproportionate Gas Sales* (1990) 26 Tulsa L.J. 135, 136, fn. 5.) Generally, the party designated as the operator has full control of all operations subject to the terms of the operating agreement, and the nonoperators are investors in the project with a relatively inactive role. (See McArthur, *Coming of Age: Initiating the Oilfield into Performance Disclosure* (1997) 50 SMU L.Rev. 663, 665.)

To accomplish its purpose of defining the rights and responsibilities of the owners of the working interest in a tract of land, the 1989 Form 610 is divided into 16 separate articles and addresses topics that include (1) the interests of the parties in the oil and gas, and in costs and production (article III); (2) the designation, responsibilities, rights and duties of the operator (article V); (3) drilling and development (article VI); (4) expenditures and liabilities of the parties (article VII); and (5) the acquisition, maintenance or transfer of interests (article VIII). In addition, article II allows the parties to further define their relationship by attaching other documents to the operating agreement as exhibits and incorporating them by reference. The exhibits may include information about the land and oil and gas interests subject to the agreement (exhibit A), an accounting procedure form (exhibit C), and a gas balancing agreement (exhibit E). These exhibits are discussed below.

### B. *Exhibit C to Form 610, the COPAS Accounting Procedure Form*

The Council of Petroleum Accountants Societies (COPAS), a national organization since 1961, has issued a succession of accounting forms which serve as the primary source of oil and gas accounting standards in the industry. The accounting procedure forms issued by COPAS are intended to be used as an exhibit to Form 610. (McArthur, *A Twelve-Step Program for COPAS to Strengthen Oil and Gas Accounting Protections* (1996) 49 SMU L.Rev. 1447, 1448–1449, 1451 & fn. 4 (hereafter *COPAS Oil and Gas Accounting*).) A COPAS accounting procedure form issued in 1985 was used by the parties here.

Generally, the COPAS accounting procedure form focuses on accounting for the costs of a project and does not govern revenue practices. (*COPAS Oil and Gas Accounting, supra,* 49 SMU L.Rev. at p. 1485.) For example, the COPAS form does not include a calculation or disclosure of the overall net revenue interest.[3] Instead, revenue matters are addressed, with varying degrees of specificity, in Form 610 and its other exhibits. (*COPAS Oil and Gas*

---

[3] Armstrong's net revenue interest was the major point of controversy at trial.

*Accounting, supra,* at pp. 1484, 1485 [urging revision of the COPAS form to disclose net revenue interest].)

When disputes arise concerning costs, article I.4 of the 1984 COPAS accounting procedure provides that the operator's invoices "shall conclusively be presumed to be true and correct" unless challenged within 24 months of the calendar year in which they are rendered. The practical impact of enforcing this clause is that investors must usually challenge disputed charges sooner than otherwise required under the statute of limitations applicable to contractual disputes. (See § 337, subd. 1 [four-year limitation period]; see generally *Exxon Corp. v. Crosby-Mississippi Resources, Ltd.* (5th Cir. 1995) 40 F.3d 1474 [addressing the enforceability of the presumption in article I.4 under Mississippi law].)

### C. *Exhibit A to Form 610*

Under article II.A of the 1989 Form 610,

"Exhibit 'A' shall include the following information: [¶] (1) Description of lands subject to this agreement, [¶] (2) Restrictions, if any, as to depths, formations, or substances, [¶] (3) Parties to agreement with addresses and telephone numbers for notice purposes, [¶] (4) Percentages or fractional interests of parties to this agreement, [¶] . . . [¶] (6) *Burdens on production.*" (Italics added.)

Sometimes, the provision concerning information about burdens on production receives only token compliance, i.e., "[t]he operator lists the leases and the burden on each, but does not calculate the overall net revenue interest—the percentage of the total mineral estate—that will be divided up among the investors." (*COPAS Oil and Gas Accounting, supra,* 49 SMU L.Rev. at p. 1484.)

### D. *Exhibit E to Form 610, the Gas Balancing Agreement*

Tri-Valley and Armstrong chose to include a gas balancing agreement as exhibit E to their operating agreement. Unlike Form 610 and the COPAS accounting procedure contained in exhibit C to the Form 610, this gas balancing agreement was not prepared on a preprinted, copyrighted form.

Among other things, the gas balancing agreement provides that "[e]ach party has the right to take its share of gas produced from the area covered by th[e operating a]greement and to sell its share of gas for itself . . . ." In the oil and gas industry, this provision is referred to as a "take in kind" provision and it is "included in operating

agreements to avoid the tax consequences of being classified as an association taxable as a corporation [citation]." (*Harrell v. Samson Resources Co.* (1998) 1998 OK 69 [980 P.2d 99, 103].) When the parties do take in kind, it is not uncommon for imbalances to occur. A gas balancing agreement attempts to set forth a method or methods for resolving the imbalance. (See Moon, *Assigning Gas Balancing Rights in the Absence of a Gas Balancing Agreement* (1993) 14 Energy L.J. 407; Pierce, *The Law of Disproportionate Gas Sales, supra,* 26 Tulsa L.J. 135.)

## FACTS AND PROCEEDINGS

Tri-Valley and Armstrong are two oil and gas companies involved in a dispute over the size of Armstrong's net revenue interest in gas wells located on land designated as the Webb Tract. That tract is composed of mineral rights under leases in three separate tracts located in Contra Costa County, California. Armstrong received the right to participate in the Webb Tract as part of a 1994 global settlement of a previous dispute between Armstrong and Tri-Valley.

### *CONTRACTUAL PROVISIONS*

The specific rights and obligations of Armstrong and Tri-Valley concerning the Webb Tract were set forth in an operating agreement dated October 1, 1994 (Webb Tract JOA). The Webb Tract JOA was prepared using the 1989 version of Form 610. Pursuant to article II of the Webb Tract JOA, other documents and agreements were attached as exhibits and incorporated into the Webb Tract JOA. The exhibits included (1) exhibit A, (2) exhibit C, the 1984 COPAS form titled "Accounting Procedure Joint Operations" for onshore projects, and (3) exhibit E, a gas balancing agreement.

Under the Webb Tract JOA, the working interest in all wells on the Webb Tract is owned 7.5 percent by Armstrong and 92.5 percent by Tri-Valley, before and after payout, and Tri-Valley is designated as the "operator" and Armstrong as a "nonoperator." Under article V.A of the Webb Tract JOA, the operator "shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement."

Article III.B of the Webb Tract JOA, which defines the working interest of the parties and their interests in costs and production, states that the parties "shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter." With respect to other burdens, article III.B provides that "[r]egardless of which party has contributed any Oil and Gas Lease or Oil

and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of, 30% . . . ."

Pursuant to the terms of article II.A of the Webb Tract JOA, the information set forth in exhibit A was to include burdens on production. Despite this requirement, exhibit A to the Webb Tract JOA does not specify or state the amount of any royalty, overriding royalty or other interest that burdens the oil and gas production from Webb Tract. Although exhibit A lists the eight leases included in the Webb Tract, Tri-Valley intentionally left the actual amount of burdens undefined.[4]

To keep track of the gas imbalances that may occur under the Webb Tract JOA, article II of the gas balancing agreement provides that the "Operator under said Operating Agreement will establish and maintain currently a gas account to show the gas imbalance which exists between all parties and will furnish each of these parties a monthly statement showing the total quantity of gas produced, the amount used in lease operations, vented or lost, and the monthly and cumulative over and under account of each party." Under section VI of the gas balancing agreement, an "underproduced party may demand from any overproduced party a monetary settlement of any imbalance as to gas production" when certain events occur, such as "any time such imbalance exceeds 12 months in duration." The overproduced party is required to pay the settlement amount within 120 days after receipt of written demand.

*PRODUCTION FROM THE WEBB TRACT*

The parties stipulated (1) Webb Tract well No. 1 was drilled in late 1994 and began producing on January 2, 1997, (2) Webb Tract well No. 2 was drilled in early 1997 and began producing in September 1997, and (3) Webb Tract achieved "payout" on September 30, 1997. Based on these underlying facts, the parties further stipulated that the working interest participation in production from the Webb Tract should be calculated using (1) the "before payout" percentages from January 2, 1997, until and including September 30, 1997, and (2) the "after payout" percentages for all production after September 30, 1997.

The parties also stipulated to the gross production in millions of BTU's from the Webb Tract for each month from January 1997 through February 2002, inclusive.

---

[4] Tri-Valley does not challenge the trial court's specific finding of fact regarding its intent.

After Webb Tract well No. 1 began producing, Tri-Valley sent Armstrong a "division of interest" letter that stated Tri-Valley's view of what figure should be used as Armstrong's net revenue interest. By letter dated March 4, 1997, Armstrong expressed disagreement with the net revenue interest calculated by Tri-Valley because the calculation included burdens on production in favor of Tri-Valley and Tri-Valley's consulting geologist, Keith Drummond.

Tri-Valley responded in a letter dated March 26, 1997, and indicated that, because of the 30 percent maximum burden referenced in article III.B of the Webb Tract JOA, Armstrong's net revenue interest would be calculated using 70 percent.[5] The parties exchanged further correspondence, but did not resolve the disagreement regarding Armstrong's net revenue interest.

The monthly operating statement for March 1997 issued to Armstrong on behalf of Tri-Valley calculated Armstrong's share of the oil and gas sales based on a net revenue interest of 5.25 percent. The subsequent monthly operating statements also calculated Armstrong's share of sales or production using a net revenue interest of 5.25 percent. After 1997, Armstrong took control of marketing its share of the production.

On May 30, 2001, Armstrong filed a complaint against Tri-Valley, alleging a cause of action for breach of contract and a cause of action for declaratory relief. Tri-Valley answered the complaint with a general denial and the assertion of affirmative defenses which included the allegation that Armstrong's complaint was time barred by the statute of limitations set forth in section 337, subdivision 1.

A bench trial was held on May 20, 2002. The trial court filed an amended statement of decision on October 4, 2002. Because the Webb Tract JOA does not specifically identify the burdens on production and because Tri-Valley has not challenged the findings of fact of the trial court, we quote at length the portion of the trial court's statement of decision that identifies those burdens:

"During the negotiations [of the Global Agreement by the parties] ARM-STRONG asked that TRI-VALLEY explain the nature of ownership of, or rights to, the mineral interests lying within the Webb Tract area, to disclose any documentation of agreements, assignments, related to those mineral interests, and for a 'Lease Schedule' showing what landowner and overriding royalties which Armstrong Petroleum would be expected to pay by virtue of participation in the Webb Tract Area.

---

[5] Multiplying Armstrong's 7.5 percent working interest by 70 percent produces a net revenue interest of 5.25 percent (100% - 30% = 70% x 7.5% working interest = 5.25% net revenue interest).

"TRI-VALLEY responded and provided a lease schedule which showed various landowner and overriding royalty interests. ARMSTRONG objected to the inclusion of overriding royalty interests in favor of TRI-VALLEY and sent TRI-VALLEY a revised lease schedule which deleted the overriding royalties in favor of TRI-VALLEY and its geologist, Keith Drummond.

"In response, TRI-VALLEY asserted that [¶] 'Keith Drummond the originating geologist is not a [Tri-Valley] employee . . . [h]owever, as agreed, Armstrong will not bear any [Tri-Valley] employee [overriding royalty interest].'

"The parties signed the GLOBAL AGREEMENT on October 24, 1994, under which, ARMSTRONG received 'a right to participate for 7.5% of 100% working interest under the Webb Tract Operating Agreement' ('WEBB TRACT JOA'), subject to certain 'burdens on production.' Article II of the WEBB TRACT JOA provides that the 'burdens on production' are set forth in Exhibit 'A' which lists only the 8 leases included in the WEBB TRACT. No additional 'burdens on production' were set forth in the WEBB TRACT JOA.

"The parties stipulated that the combined total burdens on production created by the leases total 19.640661% 'Before Payout,' and 20.175% 'After Payout'. The parties also stipulated at trial that, exclusive of any overriding royalty interest claimed to exist in favor of either TRI-VALLEY, or its consulting geologist, Keith Drummond, additional overriding royalties totaling 0.42421875% had been recorded against the WEBB TRACT leases. In addition, the parties stipulated that Keith Drummond previously had acquired a 0.14140625% overriding royalty from Sierra Energy, a prior owner of several of the leases. .

"Excluding the overriding royalty interests assessed in favor of Tri-Valley and the overriding royalty assigned to Drummond by Tri-Valley the total 'burdens on production' applicable in the WEBB TRACT are 20.206286% before payout, and 20.740625% after payout. Using these totals, ARMSTRONG's net revenue interest equates to 5.984529% before payout; and 5.944453% after payout."

Based on its determination of Armstrong's net revenue interest, the trial court awarded Armstrong breach of contract damages in the amount of $108,917.34 as well as prejudgment interest. After judgment was entered, Armstrong sought and was granted an award of $36,910 for attorney fees under an attorney fees provision contained in the global settlement by which Armstrong received its interest in the Webb Tract.

## DISCUSSION

I. *Application of the Statute of Limitations to a Breach of the Webb Tract JOA*

In California, four years is prescribed as the period for the commencement of "[a]n action upon any contract, obligation or liability founded upon an instrument in writing . . . ." (§ 337, subd. 1.) The parties agree that this four-year statute of limitations applies to the breach of the Webb Tract JOA, but dispute whether there was a single, time-barred accrual or multiple accruals for statute of limitations purposes.

Tri-Valley argues that the Webb Tract JOA was breached on March 1, 1997, and therefore the limitation period expired two months before Armstrong filed its complaint on May 30, 2001.

Armstrong argues the monthly payments or deliveries concerning production were a series of severable contractual obligations where the duty to make each payment or delivery arose independently of the others. Based on this characterization of Tri-Valley's obligations, Armstrong argues the statute of limitations began to run on each severable obligation at the time each payment or delivery was due. As a result, Armstrong contends, damages from each underpayment or underdelivery occurring within the four-year limitations period may be recovered even though some breaches occurred more than four years before the action was filed.

The trial court found that "[t]he agreements in this case concern the production of oil and gas, over time, from a given property. Under the WEBB TRACT JOA, statements setting forth the nature of all charges and credits related to any given month's production are due no later than the end of the month following the month i[n] which such production occurred. [¶] Because the volume of production, the price, and the expenses are not predetermined, it is not possible to know, in advance, what amount is due." The trial court determined the continuing obligation to pay for actual production was like an installment and commenced the statute of limitations at the time the installment actually was due. As a result, the trial court held Armstrong's action, filed on May 30, 2001, was timely as to any production occurring after April 1, 1997, because the statement for that production was due on May 31, 1997.

In light of the contentions of the parties and the ruling of the trial court, the primary issue concerning the statute of limitations is whether or not the monthly payment or delivery obligations of Tri-Valley under the Webb Tract JOA are divisible from one another. In other words, is this a case where there was only one wrong and one accrual date, or a new, distinct wrong each month with its own accrual date?

### A. *Standard of Review*

■ The construction of a contract, unless it turns on disputed facts, is a question of law. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866 [44 Cal.Rptr. 767, 402 P.2d 839].) As such, it is subject to independent review on appeal. (*Twedt v. Franklin* (2003) 109 Cal.App.4th 413, 417 [134 Cal.Rptr.2d 740].) ■ Similarly, where, as here, the underlying facts are not in dispute, the question when a statute of limitations begins to run is one of law, subject to independent review. (See *Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 814 [107 Cal.Rptr.2d 369, 23 P.3d 601].)

### B. *Accrual of the Statute of Limitations*

■ As a general rule, a cause of action accrues and a statute of limitations begins to run when a controversy is ripe—that is, when all of the elements of a cause of action have occurred and a suit may be maintained. (*Howard Jarvis Taxpayers Assn. v. City of La Habra, supra,* 25 Cal.4th at p. 815.) Where there is a continuing wrong, however, with periodic new injury to the plaintiff, the courts have applied what Justice Werdegar has termed a "theory of continuous accrual." (*Id.* at p. 822; see also *Utility Audit Co., Inc. v. City of Los Angeles* (2003) 112 Cal.App.4th 950, 960–961 [5 Cal.Rptr.3d 520] ["continuing wrong"]; *Wells Fargo Bank v. Bank of America* (1995) 32 Cal.App.4th 424, 439, fn. 7 [38 Cal.Rptr.2d 521] ["a new breach occurs each month"].)

■ Thus, where performance of contractual obligations is severed into intervals, as in installment contracts, the courts have found that an action attacking the performance for any particular interval must be brought within the period of limitations after the particular performance was due. The situations in which this rule has been applied include not only installment con tracts (*Bank of America v. McLaughlin* (1957) 152 Cal.App.2dSupp. 911, 915 [313 P.2d 220]), but also such diverse contractual arrangements as leases with periodic rental payments (*Tsemetzin v. Coast Federal Savings & Loan Assn.* (1997) 57 Cal.App.4th 1334, 1344 [67 Cal.Rptr.2d 726]), and contracts calling for periodic, pension-like payments on an obligation with no fixed and final amount (*Conway v. Bughouse, Inc.* (1980) 105 Cal.App.3d 194, 199 [164 Cal.Rptr. 585]).

Applied to contractual disputes, the rule is but an application of the doctrine of contractual severability.

"Where a contract is divisible and, thus, breaches of its severable parts give rise to separate causes of action, the statute of limitations will generally begin

to run at the time of each breach; in other words, each cause of action for breach of a divisible part may accrue at a different time for purposes of determining whether an action is timely under the applicable statute of limitations." (15 Williston on Contracts (4th ed. 2000) § 45:20, p. 356, fns. omitted.)

■ The context of continuing—that is, periodic—accrual for periodic breach is to be distinguished from that of a single breach or other wrong which has continuing impact. (See, e.g., *Cutujian v. Benedict Hills Estates Assn.* (1996) 41 Cal.App.4th 1379, 1387, 1389 [49 Cal.Rptr.2d 166] (*Cutujian*).) It also is to be distinguished from the breach of an *entire* contract, though performance of that contract may involve "the rendering of benefits to the plaintiff before the date for final performance . . . ." (*Lubin v. Lubin* (1956) 144 Cal.App.2d 781, 791 [302 P.2d 49]; see also *Brewer v. Simpson* (1960) 53 Cal.2d 567, 593 [2 Cal.Rptr. 609, 349 P.2d 289].)

■ If the parties to its making intend an entire contract, not a severable one, the courts will not find it divisible despite periodic performance. (*Jozovich v. Central California Berry Growers Assn.* (1960) 183 Cal.App.2d 216, 222–224 [6 Cal.Rptr. 617].) Generally, the parties' intent is revealed by " 'the nature and character of the agreement . . . .' " (*Id.* at p. 224, quoting *L.A. Gas & Elec. Co. v. Amal. Oil Co.* (1909) 156 Cal. 776, 779 [106 P. 55].) Intent can further be shown by the parties' subsequent acts and conduct. (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 473–474 [80 Cal.Rptr.2d 329]; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 689, p. 622.)

Here, the parties' intent regarding divisibility of the monthly payment obligation is revealed by the provisions in their writing, as well as by their conduct, including their course of performance. (See Rest.2d Contracts, § 202(4) [course of performance given great weight].)

C. *The Monthly Performances Are Divisible*

1. *Express language of the agreements and the parties' conduct*

■ The words used in an agreement are a primary source from which to glean the parties' intent. (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912 [75 Cal.Rptr.2d 573].)

Section I of exhibit C to the Webb Tract JOA, the COPAS accounting procedure, states in pertinent part:

" 'Joint Account' shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties. [¶] . . . [¶] Operator shall bill Non-Operators on or before the last day of each month for their proportion ate share of the Joint Account for the preceding month. . . ."

The express terms of section VIII of the gas balancing agreement state:

"The provisions of this Gas Balanc[ing] Agreement shall be separately applicable and shall constitute a separate agreement as to each well and each reservoir to the end that production from one well or reservoir may not be utilized for the purpose of balancing underproduction from other wells or reservoirs."

The gas balancing agreement in addition provides for Tri-Valley to establish and maintain a gas account to show the existing gas imbalance between the parties and to furnish a monthly statement showing the total quantity of gas produced, the amount used in lease operations, vented or lost, and the monthly and cumulative over and under account for each party. Because Tri-Valley paid or delivered on a monthly basis the amount it contended Armstrong was due, no gas imbalance account was ever established or maintained. Instead, monthly operating statements showing the amount of oil and gas from the Webb Tract that was sold, its sale price, the amount of revenue generated by each sale, and Armstrong's share of that revenue were provided. Armstrong received a check for its share of the sales at the time the monthly operating statement was generated.

Thus, in both their words and conduct, the parties established a periodic procedure for the performance of their respective obligations.

### 2. *Subject matter*

The subject matter of the Webb Tract JOA and related exhibits is the production of gas and oil, over time, from the Webb Tract. The amount of money Armstrong derives from its net revenue interest depends upon the production and sale of gas, and neither the quantity of production nor the revenue it will generate can be determined in advance. Based on these undisputed facts, there is nothing inherent in the subject matter that would prevent the separation of Tri-Valley's payment or delivery obligation concerning production from a particular period from its obligation to Armstrong concerning production from a subsequent or prior period. Rather, the continuing nature of the production readily lends itself to division by the parties because gas produced during one time period is easily separated from gas

produced during another time period. (See 15 Williston on Contracts, *supra*, § 45:9, pp. 299–305 [character of subject matter as a factor in determining divisibility].)

Because the parties used a monthly accounting procedure, because the amount of periodic deliveries or payments could not be determined in advance, and because gas production is by its nature divisible, we conclude the objective manifestation of the parties' intent is that Tri-Valley's performance of part of its obligations to Armstrong by making a monthly payment or delivery is divisible from its obligations to make other monthly payments or otherwise satisfy Armstrong's net revenue interest.

In summary, Tri-Valley's incorrect interpretation of the formula for calculating Armstrong's net revenue interest was the wrong that continued over time. However, that "wrong" is not one of the four elements of a cause of action for breach of contract.[6] It simply explains why the breach of contract—the payment of the wrong amount of money to Armstrong or delivery of the wrong amount of production—was repeated each month. Because the act of paying or delivering the wrong amount constituted the breach of contract and caused damage in the amount of the underpayment or underdelivery, we conclude that all of the elements of a cause of action relating to a breach of that monthly obligation did not occur, and thus a cause of action did not accrue, until Tri-Valley made the incorrect payment or delivery for that month. (Cf. *Tsemetzin v. Coast Federal Savings & Loan Assn.*, *supra*, 57 Cal.App.4th 1334 [dispute over amount of square footage to include in formula for calculating periodic rental payment; landlord allowed to recover with respect to payments due within four years of commencement of action].)

### D. *Tri-Valley's Arguments Regarding Divisibility Are Not Convincing*

In presenting its arguments, Tri-Valley has not approached the primary issue of divisibility as one of construction to be determined in accordance with the intention of the parties. (See *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 122 [99 Cal.Rptr.2d 745, 6 P.3d 669].) Instead, Tri-Valley has attacked the trial court's determination with a variety of arguments.

First, Tri-Valley argues that the global settlement agreement and the Webb Tract JOA are not installment contracts. Specifically, Tri-Valley asserts (1) it did not have a debtor-creditor relationship with Armstrong, and (2) it did not

---

[6] "A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1388 [272 Cal.Rptr. 387].)

have a duty to Armstrong to make periodic cash payments or any cash payments for gas production. These arguments appear to be based on the unstated premise that only installment contracts contain obligations that are divisible from one another. This premise, however, is incorrect. (See *Armendariz v. Foundation Health Psychcare Services, Inc.*, *supra*, 24 Cal.4th at p. 122; see also 15 Williston on Contracts, *supra*, §§ 45:13–45:16, pp. 315–335 [addressing the divisibility of particular types of contracts].) Accordingly, whether the monthly payments or deliveries made under the Webb Tract JOA are labeled as installment obligations does not determine the question of divisibility.

Based on *Dillon v. Board of Pension Commrs.* (1941) 18 Cal.2d 427 [116 P.2d 37] (*Dillon*), Tri-Valley contends the present lawsuit is an action to determine the existence of Armstrong's right to receive a net revenue interest greater than 5.25 percent, and the action to determine the existence of such a right necessarily precedes and is distinct from an action to recover any shortfall in the monthly payments which have fallen due.

In *Dillon*, the plaintiff filed a claim with the pension board after her husband, who was a police officer, committed suicide. The board rejected the claim and the plaintiff did not file a petition for writ of mandate against the board within the applicable three-year limitation period from the denial of her claim. Because the right to the pension could only be established by bringing a claim before the pension board, and the plaintiff had not instituted an action to establish that right within the limitation period after denial of her claim, the court ruled her petition was time barred, even as to installments of the pension that would have been paid within the limitations period. (*Dillon*, *supra*, 18 Cal.2d at pp. 430–431.)

*Dillon* is distinguishable from the present case because Armstrong's contractual rights were not conditioned upon completing a claims procedure. Instead, Armstrong's right to receive a net revenue interest was established by the Webb Tract JOA. (Cf. *Howard Jarvis Taxpayers Assn. v. City of La Habra*, *supra*, 25 Cal.4th at p. 822 [periodic accrual despite opportunity for initial challenge].)

Tri-Valley also argues that its obligations regarding Armstrong's net revenue interest constitute a covenant running with the land, and that the statute of limitations for a covenant running with the land starts when the plaintiff makes a demand for performance. Tri-Valley contends this case should be determined by the rule of law that "the statute of limitations to enforce affirmative covenants running with the land, and, in particular, duties included in a declaration of CC&R's, commences when a demand for performance is made." (*Cutujian*, *supra*, 41 Cal.App.4th at p. 1387.)

■ Cutujian involved a homeowners association's breach of a single obligation to repair a slump on a lot purchased by the plaintiff. The repair obligation arose under a maintenance provision in the CC&R's applicable to the plaintiff's lot and certain common areas. (*Cutujian, supra,* 41 Cal.App.4th at p. 1382.) Although the alleged breach of the obligation to repair was continuing as to the single slump, it is not analogous to repeated, periodic breaches of divisible obligations. Consequently, we conclude the rule of law set forth in *Cutujian* is not helpful to Tri-Valley's position because demand as to one breach does not serve as demand for all separately occurring breaches of the same provision of a written agreement.

The opinion in *Ventura v. Colgrove* (1969) 270 Cal.App.2d 136 [75 Cal.Rptr. 495] is, according to Tri-Valley, controlling here. The contract in that case involved a promise to transfer an oil royalty in a parcel of land, and the alleged breach concerned whether the royalty interest actually transferred related to the proper amount of land. As in *Cutujian,* there was only one breach involved in *Ventura v. Colgrove,* i.e., the transfer of a royalty interest in a smaller area than promised. Consequently, *Ventura v. Colgrove* is distinguishable from the present case, which involves repeated breaches of Tri-Valley's periodic delivery or payment obligation concerning gas production.

Tri-Valley's final contention is an equitable argument that, because its interpretation of the agreements had not been challenged in court for a period exceeding the statute of limitations, it had developed a reliance interest in the interpretation that Armstrong's net revenue interest was 5.25 percent. Tri-Valley also presents the more general argument that "owners would be hesitant to invest in [wells and pipelines] since there would always be uncertainty regarding the percentage of ownership interest."

These arguments are not compelling. First, Tri-Valley and other owners and operators involved in projects that will require substantial investments can avoid uncertainty in their contractual relationships by clearly defining the percentages of ownership in their written contracts. (See *COPAS Oil and Gas Accounting, supra,* 49 SMU L.Rev. at p. 1484.) Second, to the extent that Tri-Valley is asserting that it reasonably relied to its detriment on its interpretation of the Webb Tract JOA, it (1) did not articulate a legal or equitable theory to the trial court in which those considerations would be relevant to the outcome, and (2) failed to prove it was reasonable in its reliance on its interpretation or that any such reliance resulted in prejudice or detriment to it. Furthermore, it appears that the uncertainty regarding the percentage of Armstrong's net revenue interest must lie at the door of Tri-Valley because it intentionally left the amount of the burdens on production undefined. Thus, Tri-Valley's equitable and policy argument fails to convince the court that reversal is required.

In summary, none of the foregoing arguments convince us that the monthly payments used to compensate Armstrong for its share of net revenue could not be divided from one another.

### E. *Analysis of Operating Agreements in Other Jurisdictions*

Despite the widespread use of Form 610 in the oil and gas industry in the United States and the lack of California case law addressing when a cause of action for breach of a payment or delivery obligation contained in an operating agreement accrues, neither party has cited any case law from other jurisdictions or any secondary authority that addresses the issue. Our own research uncovered no case arising in any other jurisdiction that supports Tri-Valley's view of when the cause of action accrues.

#### 1. *Texas case law*

A case arising under Texas law supports the view that payment obligations under an operating agreement are like installment payments for statute of limitations purposes. (*Hondo Oil and Gas Co. v. Texas Crude Operator, Inc.* (5th Cir. 1992) 970 F.2d 1433 (*Hondo Oil*).) In *Hondo Oil*, a dispute between an operator and ARCO, a nonoperator, arose over whether certain overhead costs could be billed to the nonoperators. The operator filed its action against ARCO on January 2, 1990. The parties did not dispute that ARCO withheld $53,215.11 in costs prior to January 1, 1986, and withheld $175,206.83 in costs after January 1, 1986. For reasons not explained, the parties stipulated that if a breach had occurred, the amount of damages was $170,755.03. This amount was smaller than the amount ARCO withheld after the four-year statute of limitations began to run.[7] The operator contended the trial court committed reversible error by not awarding the entire amount of stipulated damages. (*Hondo Oil*, at p. 1440.)

The Fifth Circuit Court of Appeals agreed with the operator's interpretation regarding liability for overhead expenses, held the operator was entitled to recover the full amount of the stipulated damages, and explained its decision as follows:

" 'Where a contract provides for monthly payments and not a present sale of gas or oil, a cause of action accrues when any given monthly payment is due. Only those payments due more than four years before the suit was filed are barred.' *Western Oil Fields, Inc. v. Pennzoil United, Inc.*, 421 F.2d 387, 390 (5th Cir. 1970); *see also, Gabriel v. Alhabbal*, 618 S.W.2d 894, 897 (Tex.Civ.

---

[7] In Texas, a four-year statute of limitations applies to actions related to a debt. (See Tex. Civ. Prac. & Rem. Ann. § 16.004(a)(3).)

App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.) ('When recovery is sought on a note or other obligation payable in installments the Statute of Limitations runs against each installment from the time it becomes due, that is from the time when action might be brought to recover it'). [The operator] thus was entitled to sue for payment of all amounts withheld after January 1, 1986." (*Hondo Oil, supra*, 970 F.2d at p. 1440.)

Clearly, the result reached by the Fifth Circuit Court of Appeals in *Hondo Oil* was based in part on treating the monthly payments due under the operating agreement as analogous to obligations payable in installments.[8] Although we recognize that *Hondo Oil* is not directly on point with the present case because it involved a dispute over the sharing of expenses rather than the sharing of revenue or production, we consider it persuasive authority in support of Armstrong.

### 2. *Oklahoma case law*

The Oklahoma Supreme Court has addressed a statute of limitations question in the context of a dispute concerning the sharing of production. (*Harrell v. Samson Resources Co., supra*, 980 P.2d 99.) In that case, a gas balancing dispute arose between parties that had used a 1956 version of Form 610 as their operating agreement and had not entered a gas balancing agreement. The underproduced working interest owners filed suit against the operator for the cash value of the gas imbalance. The operator argued that the statute of limitations had run on their claim. The Supreme Court of Oklahoma ruled the claim was timely and stated:

"The parties are cotenants in production from the well, and the statute of limitations does not begin to run until ouster or termination of the relationship. [Citation.] As cotenants, there existed mutual open and current accounts between the parties and an under-produced party could wait until well depletion to demand cash balancing. Accordingly, the statute of limitations would not begin to run until ouster by one cotenant of the other cotenant, which occurred when [the operator] attempted to sell its interest. Plaintiffs immediately made demand for cash balancing and filed suit shortly thereafter." (*Harrell v. Samson Resources Co., supra*, 980 P.2d at p. 104.)

This characterization of the operator's payment obligations as an open account provides less repose for operators than treating the obligations as separate installments.[9] Thus, the *Harrell* case does not support Tri-Valley's

---

[8] In its trial brief, Tri-Valley represented that it had searched and "not found a single case that holds that a joint operating agreement is an installment payment contract."

[9] In California, too, the limitation period on a "book account" begins to run from the date of the last item. (§§ 337, subd. 2, 344 [statute of limitations applicable to a mutual, open, and

position that there was a single cause of action which accrued when Armstrong had notice that Tri-Valley rejected its view of what its net revenue interest should be.

### 3. Summary

 While neither *Hondo Oil* nor *Harrell* is directly on point with the facts presented in this appeal, both cases lend support to the view that Tri-Valley's delivery or payment obligations to Armstrong concerning the gas produced were divisible and that breach of contract actions accrued periodically when defective performance was given. We adopt that view and affirm the trial court's ruling.

## II. *The Trial Court's Evidentiary Ruling Was Not Prejudicial**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed. Respondent shall recover its costs on appeal.

Buckley, Acting P. J., and Cornell, J., concurred.

A petition for a rehearing was denied April 15, 2004, and appellant's petition for review by the Supreme Court was denied June 30, 2004.

---

current account].) Under California law, however, moneys due under an express contract cannot be recovered in an action on an "open book account" in the absence of a contrary agreement between the parties. (*Tsemetzin v. Coast Federal Savings & Loan Assn.*, *supra*, 57 Cal.App.4th at p. 1343.) In *Caddo Oil Co., Inc. v. O'Brien* (5th Cir. 1990) 908 F.2d 13, 17, the Fifth Circuit held that "[a] suit to recover amounts due under a written operating agreement is a suit in contract, not a suit on an open account." Because the parties in this case did not implement the gas imbalance account mechanism set forth in their gas balancing agreement, we express no view on whether such an account could be an open book account for statute of limitations purposes.

*See footnote, *ante*, page 1375.